would not know the difference between them; he would not know the difference between that and this (indicating the two products), unless he read closely.

[3] The defendant has the right to use spearmint to flavor his gum, and to sell it. But why not wrap it up in a blue package? I have an idea that, if you would put it up in a blue package, the complainant would not complain. Why does he select pink, when he has got all the other colors of the rainbow to make a selection from—blue, and violet and yellow, and green. But he takes the complainant's color. And so as to these other markings. Wrigley has his lettered in red, and so is Colker's lettered in red. Other markings are in green on Wrigley's product, and so is Colker's in green; and it is that way all around. It is in the same colors exactly. There is no other conclusion that one can come to than that he adopted that dress in order to get Wrigley's business. And, as Colker says, he gets it without advertising. He don't have to advertise; the advertising is already done. And so Wrigley, by spending a million dollars a year in advertising his product, has to sell it at 48 cents a box; while Colker, who does not have to do any advertising, because it is already done, is able to sell his product at 20 cents a box, and perhaps that entire difference may be the difference in advertising for all we know.

I have considered the matter carefully on the application for preliminary injunction, and I am clear that this later marking is calculated to fool the purchaser, in order to get Wrigley's business. There is no other motive under the sun for dressing the thing up like that, other than to get their business. I do not know about the wording of your temporary injunction. It is possible that putting that on the market is a violation of that. The complainant is entitled to his decree.

Now, do not dress your goods up so that they resemble his. You can use the word "Spearmint" on your goods; you can plaster them all over with the word "Spearmint," if you want to; but that dress has a general resemblance to Wrigley's in looking at it a way off. Do not have them the same, and then there will be no bother. I am perfectly clear this is an infringement of the complainant's rights. They are spending money hand over fist to sell their goods by advertising their goods, and nobody else is entitled to the benefit of that advertising in putting his goods on the market.

---

## THE SARK.

(District Court, E. D. Louisiana. December 19, 1912.)

No. 14179.

1. SALES ☞150(3)—DELIVERY—CONTRACT.

Where cotton oil cake was sold for October and November shipment, delivery to a ship in December was not a compliance with the contract.

2. PRINCIPAL AND AGENT ☞123(1)—CHARTERER—AUTHORITY OF AGENT.

Evidence *held* to show that the agent of the charterer, who signed bills of lading for goods delivered to the vessel, was acting within the scope of the authority delegated by charterer.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. Judgment ⬤�441832—Conclusiveness—Effect.

>The agent of the charterer of a vessel having signed bills of lading for deliveries to the vessel, and the consignees, on faith of the bills of lading which were antedated so as to show delivery to the vessel at the date fixed by contract, having paid drafts for the purchase price, a judgment recovered by the consignees against the vessel in a foreign court is conclusive as to vessel's liability in a subsequent proceeding against the charterer by the vessel's owners.

In Admiralty. Libel by the Steamship Company Sark against the South Atlantic Steamship Company. Decree for libelant.

Geo. Denegre, of New Orleans, La., J. P. Blair, of New York City, and Victor Leovy, of New Orleans, La., for libelant.

John D. Grace, of New Orleans, La., for respondent.

FOSTER, District Judge. [1] In this matter it appears that the South Atlantic Steamship Company chartered the steamship Sark by a general charter, to load from New Orleans to one or more ports in Denmark. As a part of her cargo, the Southern Cotton Oil Company shipped some 1,250 tons of cotton oil cake to Nyborg which they had sold to the firm of J. J. Larsens of Copenhagen for October and November shipment. A part of this cotton oil cake was delivered to the steamship during the month of November, but a considerable amount of it was delivered after the first of December and some as late as the 10th of December. The portion delivered in December, of course, was not a delivery under the contract of sale. The charter party contains the usual clause, requiring the captain to sign bills of lading as presented to him. Alfred H. Clement, in charge of the charterer's office in New Orleans, however, requested permission of the captain to sign the bills of lading for him. The captain did not consent, but neither did he seriously object, and Clement did sign and issue 13 bills of lading, covering the shipments of the aforesaid oil cake, and the captain impliedly ratified the signing. Clement had, however, antedated some of the bills of lading to show that the entire shipment had been received on board during the month of November, but this part of his action the captain had no knowledge of and could not be considered to have approved. On the faith of these, the consignees of the cotton oil cake accepted, and ultimately paid, drafts for the purchase price. However, when the ship arrived in Denmark, the consignees discovered that all of the cotton oil cake had not been actually received on board during November, and instituted an action against the ship for damages, on the theory that as the price had declined they would not have accepted the shipment, owing to the default in delivery, but for the falsely dated bills of lading. The ship appeared by counsel and defended the suit, but judgment went against her, and it is the amount of her damages, growing out of the award, that libelant, her owner, is now seeking to recover.

[2, 3] In the libel Clement is alleged to be the managing director of the South Atlantic Steamship Company. He was not such an official; but it is immaterial, as he was their agent in full charge at New Orleans, conducting the business almost entirely on his own responsi-

bility. Both Clement and Trosdale, who was the general manager of the company, contented themselves, when testifying, with denying that the former was the managing director of the company, and said nothing about the scope of his authority. Meyers, president of the company, testifies Clement's authority to sign bills of lading depended on the form of the charter party. The form of the bill of lading prepared by them indicates that it was their intention that Clement should sign bills of lading for the captain, and there is testimony by respondents' witness Pearce tending to show that it is customary for the ship agent to sign bills of lading for the captain at New Orleans in certain circumstances. I am convinced that Clement acted within the scope of the authority delegated to him by the charterers, and that his action in predating the bills of lading was deliberate and fraudulent.

It is contended by respondents that as the ship would not be liable for a bill of lading signed by the master, or some one for him, when the goods were not actually received, there was no liability in this case; but I consider that contention entirely beside the issue.

The verdict of the Danish court is conclusive on the parties, and the ship was made to suffer through the wrongful act of respondents' agent acting within the scope of his authority, and for which they are responsible.

There will be a decree in favor of the libelant as prayed for.

---

CASTLE et al. v. SWEDISH AMERICA MEXICO LINE, Limited.

(District Court, D. Maryland. September 28, 1917.)

SHIPPING ☞108—CONSIGNEES—LIABILITY.

Where the bill of lading provided that the goods should be taken from the ship by the consignee immediately it should be ready to discharge, or transhipped into lighter at the expense of the consignee, a consignee is liable for his just share of the expense of discharging the cargo into ocean-going barges; the consignee furnishing no wharfage facilities and not providing lighters until several days after notified.

In Admiralty. Libel by William A. Castle, Leon Gottheil, and Frank C. Overton, copartners doing business as Castle, Gottheil & Overton, against the Swedish America Mexico Line, Limited. Libel sustained in part; otherwise, dismissed.

Maloy & Brady and George M. Brady, all of Baltimore, Md., for libelants.

Harry N. Abercrombie, of Baltimore, Md., for respondent.

ROSE, District Judge. The libelants are consignees of certain bales of wood pulp. In the bill of lading is found the provision following:

"The goods to be taken from the ship by the consignee immediately the vessel is ready to discharge, and as fast as she can deliver, either night or day, or the same will be transhipped into lighter, or landed, or warehoused, at the expense and risk of the proprietors of such goods."