CARL L. VIETOR, Appellant, *v.* THE NATIONAL CITY BANK OF NEW YORK, Respondent.

First Department, April 7, 1922.

**Ships and shipping — action to recover balance due on letter of credit issued to pay for goods to be shipped from New York to Barcelona — defense that plaintiff failed to comply with condition in letter of credit requiring shipment before certain date — bills of lading — error to exclude certain evidence tending to show recently established custom to treat delivery to transportation company as actual shipment — custom matter of fact.**

In an action to recover a balance due on a letter of credit, issued to provide for the payment for goods shipped from New York to Barcelona, Spain, where the defense was that the plaintiff had not shipped the goods within the time limited in the letter of credit, having merely delivered them to the steamship company and taken its "received for transportation" bill of lading, the ship which was to transport them not even being at the time in port, it was reversible error for the court to exclude a circular letter, issued by the defendant to its various customers and correspondents less than two months after the letter of credit in question was issued and some four months before shipment was to be made by plaintiff, which set forth regulations for payments under export commercial credits, adopted by the New York Bankers Commercial Credit Conference of 1920, and purporting to be subscribed to by the defendant and a large number of important banks in various parts of the world, which regulations provided for payment on "received for transportation" bills of lading, giving as an explanation for such action that the steamship lines constituting the Transatlantic Conference state that the customary procedure necessitated by American port conditions is to issue bills of lading against the receipt of goods into the custody of the steamship owners or agents and that it is impossible to issue "on board" bills of lading. It was likewise reversible error to exclude the testimony offered by plaintiff of the assistant head of defendant's export commercial credit department and of another banker of large experience in commercial credit matters tending to show the existence of the custom of treating delivery to the steamship company as shipment and knowledge thereof by defendant.

Custom is not a matter of opinion gained merely by conversation with others, but is a matter of fact and must be shown by those who have observed the method of transacting the particular kind of business as conducted by themselves and others.

APPEAL by the plaintiff, Carl L. Vietor, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 19th day of March, 1921, upon the verdict of a jury, and also from an order entered in said clerk's office on the 28th day of March, 1921, denying plaintiff's motion for a new trial made upon the minutes.

*Louis F. Doyle* [*Herbert R. Limburg* of counsel; *Morris J. Hirsch* and *Emmett F. Smith* with him on the brief], for the appellant.

*Shearman & Sterling* [*Carl A. Mead* of counsel; *Chester B. McLaughlin, Jr.,* with him on the brief], for the respondent.

DOWLING, J.:

The complaint herein sets forth the following facts: Defendant is a domestic banking corporation organized under the laws of the United States, and having its principal place of business in the borough of Manhattan, city of New York. About May 24, 1920, for value received, it duly issued and delivered to plaintiff (doing business under the firm name of Rockhill & Vietor) a letter of credit dated May 24, 1920, in the following form:

" THE NATIONAL CITY BANK
OF NEW YORK.

" NEW YORK, *May 24th,* 1920.

" Capital fully paid      $25,000,000

" Surplus & Undivided

" Profits      $52,000,000

" AH

" In replying please quote initials. When referring to this credit, please mention our No. FE; 58525.

' Cable address ' Citibank '

" Messrs. ROCKHILL & VIETOR,

" 22 Cliff Street, New York City:

" DEAR SIRS.— We have been requested to open a credit in your favor under the terms and conditions stipulated below:

No. 10155.

" Opened by   National City Bank of New York, Barcelona, Spain.

" Account      G. Deandreis.

" Amount      Up to $187,500. (One Hundred Eighty Seventy Thousand Five Hundred Dollars).

" Available by draft at sight on us, bearing credit No. FE; 58525.

" Covering 6,000 cases Tin Plates, 112 plates 270 pounds (weight) per box at $31.25 per box, C. I. F. Barcelona. Shipment within October 15th, 1920.

" Drafts drawn under this credit must be presented not later than October 14th, 1920, unless sooner revoked.

" Documents required

Full set ocean bills of lading issued to order of National City Bank of New York, Barcelona, Spain, Invoice in triplicate. Insurance certificate, including mine risk.

Consular invoice.

" Payment will be facilitated if this advice accompanies your documents when presented at our Export Commercial Credit Department. If transfer is requested this advice must be surrendered for cancellation.

" This is not to be regarded as a confirmed credit, or an agreement on our part, and is therefore subject to modification or revocation at any time.

" Please note that we can only accept Bills of Lading issued by the transportation company carrying the goods.

" Respectfully yours,

" THE NATIONAL CITY BANK OF NEW YORK,

" p. p.            .            S. J. SULLIVAN.

" If impossible to comply with the conditions stated above, communicate with us before making shipment. The conditions embodied in this credit must be adhered to, otherwise payment will not be effected.

" Important notice.

" In order to avoid any misunderstanding in regard to the credit outlined in the accompanying communication, we beg to say that this is Not a Confirmed Credit and consequently is subject to revocation at any time, either by the parties granting the credit or by ourselves under certain conditions. In the absence of any statement to the contrary, the National City Bank of New York assumes no obligation whatsoever to make the payment, even if all the conditions of credit have been complied with.

" If this is not acceptable to you please communicate with your customer and request him to have his banker amend the instructions.

" Please note for your guidance that a Confirmed Credit is absolutely irrevocable provided the conditions of the credit have been complied with."

Thereafter and on or about May 27, 1920, for value received, defendant duly issued and delivered to plaintiff the following letter altering the letter of credit by making same a confirmed and irrevocable credit:

"THE NATIONAL CITY BANK
OF NEW YORK.
"NEW YORK, *May* 27, 1920.
" Capital Fully Paid      $25,000,000
" Surplus & Undivided
" Profits      $55,000,000
" In replying please quote
initials FE-13
" Cable Address ' Citibank '
" Messrs. ROCKHILL & VIETOR,
" 22 Cliff Str.,
" New York City:
" DEAR SIRS.—
" RE: Credit FE-58525
" A/C G. Deandreis.
" Referring to the above credit advised to you on May 24th, 1920, in amount of $187,500, and confirming our telephone conversation of this afternoon, we wish to inform you that we have to-day received a cable from our Barcelona branch, instructing us to consider this credit as confirmed and irrevocable for their account.

" All other conditions remain unchanged.
" Yours very truly,
" THE NATIONAL CITY BANK OF NEW YORK,
' AHG: JM      p. p. G. KAUMHEIM."

Prior to the 14th day of October, 1920, and in reliance upon the name and credit of the defendant, the National City Bank of New York, plaintiff duly presented to defendant sight drafts upon defendant aggregating the sum of $91,093.75 bearing credit No. FE; 58525, together with the other documents specified in said letter of credit, to wit, full set ocean bills of lading issued to order of National City Bank of New York, Barcelona, Spain, invoice in triplicate, insurance certificates, including mine risk, and consular invoice, said documents covering 2,915 cases of tin plates, 112 plates 270 pounds (weight) per box, at $31.25 per box, c. i. f. Barcelona, shipment within October 15, 1920, and said defendant paid to the plaintiff said sum of $91,093.75 therefor.

Thereafter and prior to the 14th day of October, 1920, plaintiff, in reliance upon the name and credit of defendant, the National City Bank of New York, and the promises contained in said letter of credit, shipped the balance of the goods specified in the said letter of credit, and on October 13, 1920, duly presented to defendant additional sight drafts upon the defendant aggregating the sum of $96,406.25, bearing said credit No. FE; 58525, together

with the other documents specified in said letter of credit, to wit, full set ocean bills of lading issued to the order of the National City Bank of New York, Barcelona, Spain, invoice in triplicate, insurance certificates, including mine risk and consular invoice, said documents being similar in form to those theretofore accepted by said defendant under said credit, and covering 3,085 cases of tin plates, 112 plates 270 pounds (weight) per box, at $31.25 per box, c. i. f. Barcelona, shipment within October 15, 1920; and on said 13th day of October, 1920, plaintiff duly demanded payment from defendant of said sum of $96,406.25 therefor.

Defendant has failed, neglected and refused to pay the same or any part thereof, to the plaintiff's damage in the sum of $96,406.25. There is a final allegation that plaintiff has fully performed all the conditions of the agreement on his part to be performed.

The answer of the defendant denies that it received any value from plaintiff for the letter of credit or the confirmation of the same; admits the presentment of the drafts, demand for payment therefor, and that no part thereof has been paid and denies most of the other allegations of the complaint.

Upon the trial the following facts were admitted by written stipulation of the parties:

1. That on October 13, 1920, the plaintiff presented to the defendant a draft drawn by the plaintiff, dated October 11, 1920, whereby the plaintiff directed the defendant to pay to the order of the plaintiff at sight the sum of $50,250.

2. That the said draft was drawn under and in the form required by the defendant's letter of credit No. FE; 58525 sued upon herein.

3. That at the time of such presentation of the said draft to the defendant there accompanied said draft and was tendered to the defendant therewith the plaintiff's invoice in triplicate covering 1,608 cases tin plates, 112 plates 270 pounds (weight) per box, at $31.25 per box, c. i. f. Barcelona, making the amount of said invoice $50,250. At the time of such presentation there also accompanied the said draft and was tendered to the defendant therewith consular invoice and insurance certificate covering the said goods, and the said invoices, consular invoice and insurance certificates were in the form required by said letter of credit.

4. That at the time of the presentation of said draft to the defendant there also accompanied said draft and was tendered to the defendant therewith a certain document in triplicate (being a full set thereof), dated at New York city, October 11, 1920,

36

signed by Manuel Romani, agent of Compania Trasmediterranea, whereby said Compania Trasmediterranea acknowledged receipt from the plaintiff of the said goods described in paragraph 3 of this stipulation, to be transported by the steamship *Guillen Sorolla* or following steamer from the port of New York to Barcelona, Spain, and delivered to the order of the defendant at Barcelona.

5. That on or before the said October 11, 1920, the plaintiff delivered the said goods into the custody of said Compania Trasmediterranea for transportation to Barcelona, pursuant to the said document, but the said goods were not actually loaded upon said steamship *Guillen Sorolla* or any other steamship on or prior to October 15, 1920, and the said steamship *Guillen Sorolla* was not in the port of New York at the time when the said goods were delivered to the said Compania Trasmediterranea, or at any time after the delivery of said goods and on or before October 15, 1920.

6. That on October 13, 1920, plaintiff presented to the defendant a draft drawn by the plaintiff, dated October 11, 1920, whereby the plaintiff directed the defendant to pay to the order of the plaintiff at sight the sum of $19,187.50.

7. That the said draft was drawn under and in the form required by the defendant's letter of credit No. FE; 58525 sued upon herein.

8. That at the time of such presentation of the said draft to the defendant there accompanied said draft and was tendered to the defendant therewith the plaintiff's invoice in triplicate covering 614 cases tin plates, 112 plates 270 pounds (weight) per box, at $31.25 per box, c. i. f. Barcelona, making the amount of said invoice $19,187.50. At the time of such presentation there also accompanied the said draft and was tendered to the defendant therewith consular invoice and insurance certificate covering the said goods, and the said invoices, consular invoice and insurance certificate were in the form required by said letter of credit.

9. That at the time of the presentation of said draft to the defendant there also accompanied said draft and was tendered to the defendant therewith a certain document in triplicate (being a full set thereof), dated at New York city, October 11, 1920, signed by the Ocean Transportation Corporation, whereby said Ocean Transportation Corporation acknowledged receipt from the plaintiff of the said goods described in paragraph 8 of this stipulation for transportation on the steamship *Sylvia Victoria* or by later steamship from the port of New York to Barcelona, Spain, and delivered to the order of the defendant at Barcelona.

10. That on or before the said October 11, 1920, the plaintiff

delivered the said goods into the custody of said Ocean Transportation Corporation for transportation to Barcelona, pursuant to the said document, but the said goods were not actually loaded upon the said steamship *Sylvia Victoria* or any other steamship on or prior to October 15, 1920, and the said steamship *Sylvia Victoria* was not in the port of New York at the time when the said goods were delivered to the said Ocean Transportation Corporation or at any time after the delivery of said goods and on or before October 15, 1920.

11. That on October 13, 1920, the plaintiff presented to the defendant a draft drawn by the plaintiff, dated October 13, 1920, whereby the plaintiff directed the defendant to pay to the order of the plaintiff at sight the sum of $26,968.75.

12. That the said draft was drawn under and in the form required by the defendant's letter of credit No. FE; 58525 sued upon herein.

13. That at the time of such presentation of the said draft to the defendant there accompanied said draft and was tendered to the defendant therewith the plaintiff's invoice in triplicate covering 863 cases tin plates, 112 plates 270 pounds (weight) per box, at $31.25 per box, c. i. f. Barcelona, making the amount of said invoice $26,968.75. At the time of such presentation there also accompanied the said draft and was tendered to the defendant therewith consular invoice and insurance certificate, covering the said goods, and the said invoices, consular invoice and insurance certificate were in the form required by said letter of credit.

14. That at the time of the presentation of said draft to the defendant there also accompanied said draft and was tendered to the defendant therewith a certain document in triplicate (being a full set thereof), dated at New York, October 11, 1920, signed by Ocean Transportation Corporation, whereby said Ocean Transportation Corporation acknowledged receipt from the plaintiff of the said goods described in paragraph 13 of this stipulation, for transportation on board the steamship *Sylvia Victoria* or by later steamship from the port of New York to Barcelona, Spain, and delivered to the order of the defendant at Barcelona.

15. That on or before the said October 11, 1920, the plaintiff delivered the said goods into the custody of said Ocean Transportation Corporation for transportation to Barcelona pursuant to said document, but the said goods were not actually loaded upon said steamship *Sylvia Victoria* or any other steamship on or prior to October 15, 1920, and the said steamship *Sylvia Victoria* was not in the port of New York at the time the said goods were delivered to the said Ocean Transportation Corporation or at

any time after the delivery of said goods and on or before October 15, 1920.

16. All of the tin plates hereinbefore referred to, amounting in all to 3,085 cases, were sold by the plaintiff on November 16, 1920, and the plaintiff realized from such sale the sum of $47,138.48, and it is stipulated that the said sum was the fair market value of said goods at the time of such sale.

The issue which was litigated upon the trial is thus stated by the learned trial court in his charge to the jury:

" This action is brought to recover a balance claimed to be due to the plaintiff from the defendant bank, on a letter of credit issued by the latter to the former. It appears from the evidence that one G. Deandries, of Barcelona, Spain, purchased of the plaintiff, who did business under the name of Rockhill & Vietor, certain goods consisting of tinplates amounting to $187,500. The buyer of the goods deposited, through the Barcelona bank, with the defendant, a sum equal to the purchase price, and the defendant issued to the plaintiff a letter of credit dated May 24th, 1920. That letter of credit contains a clause reading:  ' Shipment within October 15th, 1920.'  The controversy turns upon the meaning of the word ' shipment.'

" The plaintiff delivered goods to the value of $91,093.75, which was paid by the defendant. The balance of the goods were delivered to a steamship company, which issued a bill of lading. The steamer on which the goods were to be shipped was not in the port of New York when the goods were received by the steamship company, and it issued its bill of lading.

" The plaintiff claims to have established by the evidence — of course, it is for you to say whether that contention is borne out by the record — that under a usage of trade which he claims to have established, the term shipment within the specified time means the delivery of the goods to a steamship company within the contractual period, irrespective of whether the goods are on board of the specified vessel or on the dock alongside of such vessel, and that the production of a bill of lading issued under such circumstances is a full and complete compliance with the terms of shipment as contained in the letter of credit.

" The defendant bank, on the other hand, claims that there is no such usage as claimed by the plaintiff; but that on the contrary, it is established by the evidence that there is a general custom among shippers of goods and banks issuing letters of credit in the port of New York, that the term shipment within a specified period of time means that before the expiration of the term of credit, the goods must either be on the dock alongside the vessel

which is to convey the goods, or actually on board such vessel. The defendant therefore claims that since the vessel which was to carry the goods was not in the port of New York on October 15th, 1920, within which date shipment of the goods was to be made, the plaintiff failed to perform the terms and conditions of the letter of credit, and therefore is not entitled to any sum whatever under it."

And further: " If you are satisfied that there was no general custom of the character claimed by the plaintiff, you will find for the defendant. So will you find for the defendant if you believe that it was the general custom in the trade in the port of New York that the term shipment within the period mentioned means the delivery of the goods to the steamship company, by the time fixed by the contract, either on the dock alongside of the vessel that is to carry the goods, or on board of the vessel; — in that event you will find for the defendant. But, if you are satisfied, gentlemen, that the word shipment within the period that has been mentioned means the delivery of the goods to a steamship company at or before the time fixed, and the issuance by it of a bill of lading, irrespective of whether the vessel was in the port of New York or not, then and only then, will you find a verdict for the plaintiff."

The issue thus clearly defined for the consideration of the jury had been sharply contested upon the trial. Plaintiff produced numerous witnesses who testified in support of his contention that by usage and custom the term " shipment " as used in the letter of credit in question meant, and was intended by the parties to mean, the delivery of the goods into the custody of the steamship company and taking its bill of lading therefor. And this is claimed to be so, whether the goods were placed on a steamer or put on the dock and whether the steamer by which they were to be shipped was, or was not, in the port of New York at the time the bill of lading was issued. Numerous witnesses for defendant denied that any such usage or custom existed, although one witness testified that " if a steamship bill of lading is presented signed by an old established line for a certain steamer, you certainly would accept the bill of lading and make payment against it without questioning it any further."

Concededly the bills of lading which are in evidence in this case are not what were originally known to the law under that name. As was said by Mr. Justice MCCARDIE in *Diamond Alkali Export Corporation* v. *Fl. Bourgeois* (L. R. [1921] 3 K. B. 443, 449): " From the earliest times a bill of lading was a document which acknowledged actual shipment on board a particular ship. In

Bennett's History of the Bill of Lading (Cambridge Press, 1914), at page 8, is this passage: 'Desjardins says that towards the close of the 16th century the use of the Bill of Lading was widespread — he quotes a definition from LeGuidon de la mer, a document of that epoch, which defines the Bill of Lading as " the acknowledgment which the master of the ship makes of the number and quality of the goods loaded on board: " ' see Desjardin's Traité de Droit Commercial Maritime, Tome 4, Art. 904 (Paris, 1885). It is clear, I may add, that the bill of lading sprang from the ship's book of lading, which was a document of recognized importance showing the goods actually put on board."

Two of the bills of lading in question were issued by the Ocean Transportation Corporation. They did not purport to be signed by the master of any vessel, but by the agent of the corporation itself. The third bill was issued by Compania Trasmediterranea and likewise was signed by its agent. Nor did these documents acknowledge the receipt of the goods on board ship; they only recited their receipt for transportation. Nor were the goods even agreed to be transported by any particular steamship absolutely. In one case they were " to be transported by the good Spanish Steamship ' *Guillen Sorolla* ' or following steamer; " in the other two cases " for transportation on board the Steamship *Sylvia Victoria* — or by later steamship." Nor was either of said steamships in the port of New York when the bills of lading were issued, nor did either of them arrive or receive the goods in question on board before the date fixed for shipment, October fifteenth.

But these facts, which under the earlier maritime usage and custom would have precluded plaintiff's recovery, are not necessarily determinative of this action. For it is claimed that the exigencies of war completely changed shipping conditions in this port, so that from necessity a new custom arose which was universally adopted and recognized, and which led to a new form of bills of lading and to a new interpretation by bankers, shippers and business men generally of what constituted shipment. There is ample testimony that the scarcity of steamers, coupled with the increase in exports, led to a congestion of freight and to an inability or unwillingness upon the part of steamship companies to contract to transport goods on any particular steamship. It may well be credited that these companies were unable to follow the old practice and to issue bills of lading for such goods only as were actually received on board their steamer when even their safe arrival in this port was a matter of uncertainty, and when the ordinary perils of the sea were added to by the dangers of actual warfare. Shippers under these conditions were in no position to insist on

shipment of their goods by any particular steamer, and to await the actual arrival of a steamer before goods could be delivered for transportation thereon would have led to endless congestion and confusion. Nor is it unreasonable to suppose that steamship companies were quite unwilling to bind themselves to private shippers, not knowing what governmental demands might be made upon them. In any event, it does appear that as the result of war conditions, and as far back as 1915 or 1916 according to one of defendant's witnesses, a custom sprang up by which bills of lading, instead of being the master's acknowledgment that goods had been received on board his vessel, were issued by the steamship company, and acknowledged the receipt of goods to be transported by a named vessel or a later or following one. And with this is claimed to have become of universal acceptation the custom or usage by which " shipment " came to mean, not the actual placing of the goods on a vessel for carriage, but the delivery thereof to a steamship company for transportation and its acknowledgment of the receipt thereof for transportation by a named steamer or a following one, even when the former was not at the time in this port.

Some of defendant's witnesses seek to limit this custom to the newer steamship companies, claiming that the older established lines protected themselves under the old forms by a provision that they might forward by a later steamer; some claim that this practice ceased with the end of war conditions. But plaintiff's witnesses testify that the custom was universally recognized when adopted under war conditions; that it was still a universal custom when the letter of credit and the bills of lading were issued; that it still existed here at the time of the trial, and that under that usage or custom " shipment " was accepted as meaning the delivery of goods to the ocean carrier for transportation and the date of such delivery was accepted as the date of shipment. In this connection it is to be noted that plaintiff was not in a position to frame his own bill of lading or other evidence of shipment. Under the terms of the letter of credit issued by defendant he was advised: " Please note that we can only accept Bills of Lading issued by the transportation company carrying the goods." He could, therefore, tender to defendant only such documents as the carrier furnished to him, and which would be such as were issued pursuant to the general usage or custom of such carriers at this port.

This being the issue, we are of the opinion that the judgment appealed from must be reversed because of the exclusion of evidence offered by plaintiff, entirely germane to that issue and which

First Department, April, 1922. [Vol. 200

should have been submitted to the jury to aid it in arriving at a proper verdict.

John M. Potter was called as a witness by plaintiff. He is assistant head of the export commercial credit department of the defendant. He testified that on July 19, 1920, the following letter was sent out to its various correspondents and customers by the defendant:

" REGULATIONS

AFFECTING

EXPORT COMMERCIAL CREDITS

ADOPTED BY THE

NEW YORK BANKERS

COMMERCIAL CREDIT CONFERENCE

OF 1920

" Subscribed to by:

The American Exchange National Bank
American Express Company
American Foreign Banking Corporation
The Anglo-South American Bank, Limited
Asia Banking Corporation
Banca Commerciale Italiana
Bank of Montreal
Bankers Trust Company
Banque Industrielle de Chine
Messrs. Brown Brothers and Company
The Canadian Bank of Commerce
The Chase National Bank
Colonial Bank
Columbia Trust Company
Commercial Bank of Spanish America, Limited
The Equitable Trust Company of New York
The Farmers' Loan and Trust Company
The First National Bank of Boston
The First National Corporation, Boston
Guaranty Trust Company of New York
International Banking Corporation
Irving National Bank
A. Iselin & Company
Knauth, Nachod & Kuhne
The Liberty National Bank of New York
The Mechanics and Metals National Bank
Mercantile Bank of the Americas, Inc.
Merchants Bank of Canada
J. P. Morgan & Co.
National Bank of Commerce in New York

The National Bank of South Africa, Limited
The National City Bank of New York
Park-Union Foreign Banking Corporation
The Shawmut Corporation of Boston
The Standard Bank of South Africa, Limited

" To Correspondents:

" Payments under Export Commercial Credits advised to the undersigned are made in conformity with the following regulations, which are in accord with the standard practice adopted by the New York Bankers Commercial Credit Conference of 1920:

" 1. We assume no liability or responsibility for the form, sufficiency, correctness, genuineness or legal effect of any documents, or for the description, quantity, quality, condition, delivery or value of the merchandise represented thereby, or for the good faith or acts of the shipper or any other person whomsoever; but documents will be examined with care sufficient to ascertain whether on their face they appear to be regular in general form.

" 2. We will interpret the terms ' documents,' ' shipping documents ' and words of similar import, as comprehending only ocean bills of lading (sailer bill of lading included) and marine and war risk insurance, in negotiable form, with invoices.

" 3. Unless specifically otherwise instructed, we will accept ' received for transportation ' bills of lading in the form customarily issued in New York. (The steamship lines constituting the Transatlantic Conference state that the customary procedure necessitated by American port conditions, is to issue bills of lading against the receipt of goods into the custody of the steamship owners or agents, for transportation by a named steamer, and failing shipment by said steamer, with liberty to ship in and upon a prior or following steamer. They state that it is not possible here to issue ' on board ' bills of lading, but have agreed, after the goods are loaded, so far as reasonably practicable, to endorse on the bills of lading, if returned for the purpose by the shippers, a dated clause to the effect that the within goods have been loaded on board, specifying any portion that has been ' short shipped.' They represent, however, that such procedure will not be reasonably practicable in all trades, nor in any trade at all times, and where used, on account of the delay involved, may result in the merchandise arriving at destination in advance of the bills of lading.) When specifically requested by a correspondent, we will request the ' on board ' endorsement, and obtain it, where practicable.

" 4. When the ' on board ' endorsement is not specifically requested by a correspondent, or it is impracticable to obtain it, the date of the bill of lading will be taken to be the date upon

which shipment has been effected. When the ' on board ' endorsement is obtained, the date of such endorsement will be taken to be the date upon which shipment has been effected.

" 5. Instructions shall be interpreted according to our law and customs, but in any event, in accordance with the following general rules:

" A. Forwarders bills of lading will not be accepted, unless specially authorized. Railroad through bills of lading will not be accepted, except on exportations to the Far East via Pacific ports, unless expressly stipulated.

" B. Bills of lading shall contain no words qualifying the acceptance of the merchandise in apparent good order and condition. If ' on board ' bills of lading are stipulated, they shall acknowledge receipt of the goods on board a named vessel. Otherwise, ' received for transportation ' bills of lading, which acknowledge the receipt of the goods into the custody of the steamship owners or agents for transportation by a named steamer, and failing shipment by said steamer with liberty to ship in and upon a prior or following steamer, will be accepted; and insurance certificates if required, shall cover shipment correspondingly.

" C. Documents for partial shipments will be accepted, even if the *pro rata* value cannot be verified, unless expressly prohibited.

" D. The use of ' to,' ' until,' ' on,' and words of similar import, in indicating expiration, is interpreted to include the date mentioned.

" E. When the indicated expiration date for payment falls upon a Sunday or legal holiday here, the expiration is extended to the next succeeding business day.

" F. The terms ' prompt shipment,' ' immediate shipment,' ' shipment as soon as possible ' and words of similar import, shall be interpreted as requiring shipment to be effected and (if the credit advice is without expressed duration) the stipulated documents presented for payment within thirty days from the date of our credit advice.

" G. Our credit advice if without expressed duration, shall not continue in force longer than one year from its date.

" H. The stipulated documents must all be presented not later than 3 P. M. (or twelve o'clock, noon, if Saturday), on the indicated expiration date.

" I. The terms ' approximately,' ' about,' or words of similar import, shall be construed to permit a variation of not to exceed ten per centum.

" J. Definitions of Export Quotations will be those adopted by The National Foreign Trade Council, Chamber of Commerce of the U. S. A., National Association of Manufacturers, American

Manufacturers' Export Association, Philadelphia Commercial Museum, American Exporters' and Importers' Association, Chamber of Commerce of the State of New York, N. Y. Produce Exchange, and New York Merchants' Association, at a conference held in India House, N. Y., on December 16, 1919.

" 6. Correspondents will understand that the above regulations shall govern in all credit transactions in the absence of other specific agreements. If the beneficiary shall make representations, or shall offer security, satisfactory to the bank, that no loss shall result to its correspondent or client by the waiver of any of such regulations or any instruction, the bank reserves the right to make such waiver, and shall recognize no claim in the premises unless substantial direct damage shall be shown to have resulted.

" THE NATIONAL CITY BANK OF NEW YORK."

This letter, after having been received in evidence by the learned trial court, who said: " It may show the knowledge of the defendant as to the general custom, as to the terms in controversy," was stricken from the record by him upon the objection made by defendant's counsel that it should not be received in evidence " because it is a circular sent out by the bank to its customers months after this letter of credit was issued." We think this ruling was erroneous. The date of sending out of this general letter was less than two months after the letter of credit herein was issued, and some four months before shipment was to be made by plaintiff. It contains most persuasive corroboration of the existence of such a custom as that claimed by plaintiff to have been in existence for some years before the date of the letter. Custom and usage do not spring up over night. They require time to receive that universal acceptance which is one of the requirements of their existence. Even this letter does not purport to be the spontaneous act of those financial institutions assenting to it, but it recites at the outset that the payments made by the defendant (as well as the others joining in the letter) " are made in conformity with the following regulations, which are in accord with the standard practice adopted by the New York Bankers Commercial Credit Conference of 1920," thus indicating clearly a still earlier date of the recognition of the custom or usage in question. Not only was it clearly error to exclude this letter, which had a most important bearing on the actual existence of the custom, but it was also reversible error to exclude testimony sought to be elicited from this witness tending to show defendant's knowledge of the alleged custom and the acts of the defendant in conformity therewith. Nothing could be more persuasive in this

case as to the existence of such a custom as is claimed to have been generally recognized and adopted in this city, than the defendant's own acts in conformity therewith and its own acceptance of the alleged meaning attached to the word " shipment."

Furthermore, it was reversible error to exclude the testimony of the witness Ketcham as to the existence of the custom or usage as to the meaning of the word " shipment," in this city, when used in letters of credit or drafts presented thereunder. He was thoroughly qualified to testify, having been assistant cashier of the National Park Bank for seventeen years, being familiar with letters of credit and issuing same as part of his duties and passing on the documents and drafts presented under such letters. He had issued an average of about 500 letters of credit a month, had passed on documents presented under letters of credit by practically all the large downtown banks, and had charge of the presentation of such documents to such banks, averaging about six a month. His testimony as to custom was apparently excluded upon the ground that he had not discussed the question with other banks, exporters or importers. But custom is not a matter of opinion gained merely by conversation with others. The most satisfactory proof is that offered by those who have ascertained its existence by their actual dealings with others, in which it has been invariably accepted and enforced. " Usage is a matter of fact, not of opinion, and must be shown by those who have observed the method of transacting the particular kind of business as conducted by themselves and others." (*Rickerson* v. *Hartford Fire Ins. Co.,* 149 N. Y. 316.)

As to the witness Obermayer, no error was committed in excluding his testimony, for he had not shown sufficient experience or knowledge to qualify as a witness to the custom in question. In so far as he was interrogated as to other transactions had by plaintiff with defendant, it did not sufficiently appear that the letters of credit therein were similar to the one sued on, or that the facts were the same.

The errors above enumerated, in our opinion, require the reversal of the judgment herein and the granting of a new trial.

The learned counsel for respondent has placed much reliance on two English cases, one holding that delivery of goods to a steamship company at the dock and the issuance by it therefor of a " received for shipment " bill of lading was not a shipment of the goods; the other, that a " received for shipment " document was not a bill of lading, such as is required under a c. i. f. contract. Both of these cases were decided in King's Bench Division by Mr. Justice McCARDIE. The first of these (decided June 30, 1921) was *J. Aron & Company (Incorporated)* v. *Comptoir Wegimont* (L. R.

[1921] 3 K. B. 435). The second (decided July 1, 1921) is *Diamond Alkali Export Corporation* v. *Fl. Bourgeois* (*supra*). In so holding, however, Mr. Justice McCARDIE expressly refused to follow the decision of the Privy Council in *Marlborough Hill* (*Ship*) v. *Cowan & Sons* (L. R. [1921] 1 App. Cas. 444) which held (Lord PHILLIMORE delivering the unanimous opinion of the Judicial Committee of the Privy Council) that a document whereby the receipt of goods is acknowledged for shipment on board a named ship or on some other ship of certain lines for carriage by sea and delivery to the shipper's order, the document being signed on behalf of the master, is a bill of lading for the purposes of the Bills of Lading Act, 1855, and the Admiralty Court Act, 1861, section 6.*

As the Judicial Committee of the Privy Council, on appeal from the Supreme Court of New South Wales in its Admiralty jurisdiction, said: " It is a matter of commercial notoriety, and their Lordships have been furnished with several instances of it, that shipping instruments which are called bills of lading, and known in the commercial world as such, are sometimes framed in the alternative form ' received for shipment ' instead of ' shipped on board,' and further with the alternative contract to carry or procure some other vessel (possibly with some limitations as to the choice of the other vessel) to carry, instead of the original ship. It is contended however, that such shipping instruments, whatever they may be called in commerce or by men of business, are nevertheless not bills of lading within the Bills of Lading Act, 1855, and it is said therefore not bills of lading within the meaning of the Admiralty Court Act, 1861.

" Their Lordships are not disposed to take so narrow a view of a commercial document. To take the first objection first. There can be no difference in principle between the owner, master or agent acknowledging that he has received the goods on his wharf, or allotted portion of quay, or his storehouse awaiting shipment, and his acknowledging that the goods have been actually put over the ship's rail. The two forms of a bill of lading may well stand, as their Lordships understand that they stand, together: The older is still in the more appropriate language for whole cargoes delivered and taken on board in bulk; whereas ' received for shipment ' is the proper phrase for the practical business-like way of treating parcels of cargo to be placed on a general ship which will be lying alongside the wharf taking in cargo for several days,

---

* See Bills of Lading Act, 1855, 18 & 19 Vict. chap. 111; Short Titles Act, 1896, 59 & 60 Vict. chap. 14; Admiralty Court Act, 1861 (24 & 25 Vict. chap. 10), § 6; since repealed by Administration of Justice Act, 1920 (10 & 11 Geo. V, chap. 81), § 21, subd. 2, sch. 1. See, also, Administration of Justice Act, 1920, § 5; Colonial Courts of Admiralty Act, 1890 (53 & 54 Vict. chap. 27), § 2, subd. 2.— [REP.

and whose proper stowage will require that certain bulkier or heavier parcels shall be placed on board first, while others, though they have arrived earlier, wait for the convenient place and time of stowage.

" Then as regards the obligation to carry either by the named ship or by some other vessel; it is a contract which both parties may well find it convenient to enter into and accept. The liberty to tranship is ancient and well established, and does not derogate from the nature of a bill of lading; and if the contract begin when the goods are received on the wharf, substitution does not differ in principle from transhipment." (pp. 451, 452.)

And further: " No doubt it appears from the margin that it is the form in use by the Commonwealth and Dominion Line, Ld., Cunard Line, Australasian service, trading from New York to Australia and New Zealand, with Funch, Edye & Co., Incorporated, as the American agents; and it may be said that it is not signed by the master, but by that firm as agents for the master. It is, however, well known that in general ships the master does not usually sign. The bills of lading are signed in the agents' office by the agents. It should perhaps be added that it is evidently contemplated by the document that the shipper will assign his rights and that the assignee or holder of the bill of lading will present the document at the port of delivery, and that his receipt and not that of the shipper will be the discharge to the shipowner." (p. 453.)

Even in the later of the two English cases relied upon by respondent (*Diamond Alkali Export Corporation* v. *Fl. Bourgeois, supra*) Mr. Justice McCARDIE said (at pp. 457, 458): " It may well be that this decision is disturbing to business men. It is my duty, however, to state my view of the law without regard to mere questions of convenience. I desire to add four remarks: (1.) That there is no finding or evidence before me of any course of dealing between the parties. (2.) That there is no finding or evidence before me of any custom or general usage which modifies the long and clearly established legal rights of a buyer under a c. i. f. contract. If any such custom or usage be asserted then the point can be dealt with in some future action in the Commercial Court." It thus appears that the issue raised by plaintiff of a custom as to what constituted shipment was not present in the English case.

The judgment and order appealed from will be reversed and a new trial ordered, with costs to appellant to abide the event.

CLARKE, P. J., SMITH, PAGE and GREENBAUM, JJ., concur.

Judgment and order reversed and new trial ordered, with costs to the appellant to abide event.