THE CAPITAINE FAURE. COOPER & COOPER, Inc., v. CAMERON et al. HARRISONS & CROSFIELD, Limited, v. SAME.

(District Court, E. D. New York. August 5, 1924.)

Nos. 5372, 5501.

1. Shipping ☞56—Subcharterer's payment by check of charter hire held not notice of subletting by charterers.

Where charter party gave charterers option of subletting steamer on notice to owner, mere fact that subcharterer paid first month's charter hire by its own check *held* not sufficient to put owner on notice.

2. Shipping ☞106—Shipper not bound to inquire as to charter, but bound by knowledge of terms of charter, though bill of lading signed by master.

Acts of 1910 and 1920 did not impose on shipper duty of inquiring whether ship was chartered or owned by party soliciting shipping, though, if actual knowledge of terms of charter were brought home to shippers, they were bound thereby, though bill of lading was signed by master.

3. Shipping ☞106—Subcharterer without power to bind ship by signing bills of lading.

Subcharterer *held* without power to bind ship by bills of lading signed by it.

4. Shipping ☞106—Subcharterer's procurement of bill of lading from master after delivery of its bill of lading to shipper does not render vessel liable to shipper.

Where original bills of lading are signed by ship's master and delivered ·to subcharterer, or where master by letter to shipper ratifies act of subcharterer in signing bills of lading, which make no reference to the charter party, ship is bound, though different rule applies where subcharterer, after signing and delivery to shipper of bill of lading, induces master to sign further bill of lading, for its own rather than the shipper's protection.

5. Shipping ☞106—Master's examination of bills of lading issued by subcharterer held not ratification sufficient to bind vessel.

Master's casual looking at bills of lading ·issued by subcharterer, and statement that they were "all right," is not a ratification of subcharterer's acts in issuing same, by which vessel is bound.

6. Shipping ☞106—Master's bills of lading, falsely showing goods on board, held not to bind ship, except for penalty for violation of law.

Master's signing of bills of lading containing indorsement "on board," when goods were not actually on board at date of bill of lading, *held* an unlawful act in excess of his authority, which did not bind the vessel, except in ·so far as she might be liable for penalty provided for violation of law.

7. Shipping ☞106—Date of bill of lading presumed also date of undated indorsement thereon.

Where "on board" indorsement on bill of lading bears no date, date of bill of lading itself should be taken as date of indorsement.

8. Shipping ☞53—Vessel discharging cargo for nonpayment of charter hire not liable to shippers of goods under bills of lading signed by charterer only.

Ship which has not broken ground is not liable for failure to carry cargo discharged on default of charterer in payment of charter hire, except as to that portion of cargo covered by original bills of lading, or by bills· of lading issued by charterer and ratified by letter of ship's master, though ship was liable for proper storage of cargo, and for loss or damage occasioned in discharging.

9. Shipping ☞152—Neither owner nor vessel liable for prepaid freight on discharge of cargo for nonpayment of charter hire.

Though freight has been prepaid to charterer on cargo covered by bills of lading signed by charterer only, neither owner nor ship is liable therefor on discharge of cargo on nonpayment of charter hire.

10. Shipping ☞131—Measure of damages for ship's wrongful discharge of cargo stated.

The measure of damages for ship's wrongful discharge of cargo, which it was obliged to carry to·designated port, is difference between market value of such cargo at time it should have arrived and market value at place of discharge when discharged.

11. Shipping ☞53—Charterer and subcharterer held liable to shippers for discharge of cargo for nonpayment of charter hire.

Charterer and subcharterer, who were not acting ·as agents of ship, *held* liable to shippers for damages for discharge of cargo on nonpayment of charter hire.

In Admiralty. Two libels, one by Cooper & Cooper, Inc., and the other by Harrisons & Crosfield, Limited, against the steamship Capitaine Faure, her engines, etc., and others. Decree for libelants.

Hunt, Hill & Betts, of New York City, for libelants.

Burlingham, Veeder, Masten & Fearey, of New York City, for claimant respondent.

CAMPBELL, District Judge. The two libels in the above-entitled suits cover the alleged claims of over 30 shippers whose goods were shipped to purchasers in the Far East, and they claim damages because the steamship Capitaine Faure discharged the goods at this port, and did not deliver the same after the charterer failed to make. the payment provided for in the charter party. These actions were consolidated by order of this court.

By a charter party dated March 21, 1923, the owner of the Capitaine Faure, through its agents in New York, entered into a uniform time charter of said steamship with the respondent Reuben I. Cameron for the term of six months from the time the steamer was delivered to said respondent Cameron, at some point within the United States: "Charterers to pay as hire at the rate of 90 cents per deadweight ton on Lloyds summer freeboard, per 30 days. * * * Payment of hire to be made in cash, in New York, without discount, every 30 days, in advance. In default of payment, owners to have the

right of withdrawing steamer from the service of charterers."

The charter party also provided, "Charterers to furnish captain with all instructions and sailing directions, * * *" and also provided: "Captain to be under the orders of charterers as regards employment, agency, or other arrangements. Charterers to indemnify owners against all consequences or liabilities arising from captain, officers or agents signing bills of lading or other documents or otherwise complying with such orders. * * *" This was not a demise, nor was the charterer the owner of said steamship pro hac vice.

[1] The charter party also provided: "Charterers to have the option of subletting steamer giving due notice to owners, but original charterers always to remain responsible to owners for due performance of this charter." No evidence was offered that any notice had been given to the owner of any subchartering or other agreement, but the respondent Fulton Steamship Corporation contend that the fact that it paid to the owner's agent by its check the first month's charter hire was sufficient to put the owner on notice. But I do not so find.

The possession under the charter party of the steamship by the charterer began abroad on April 9th. On May 4, 1923, the steamship arrived at Pier 46, Brooklyn, and began to take on cargo. This continued from day to day; the last cargo being taken on board on the 9th day of May, 1923. The loading was not completed on May 7th, and in my opinion the manifest was not prepared, the ship was not ready to sail on May 7th, and no orders were given to sail on May 7th, nor at any time before May 9th, either by the charterer, Reuben I. Cameron, or the Fulton Steamship Corporation.

On or about April 14, 1923, the time charterer, respondent Reuben I. Cameron, entered into what is termed a berth agreement with the respondent Fulton Steamship Corporation, by which the said Fulton Steamship Corporation became a subcharterer or agent for the time charterer. Thereafter the respondent Fulton Steamship Corporation proceeded to advertise and, as it contends, was seeking to establish a regular line.

No statement or promise was made to shippers that the master's bill of lading would be furnished, but the dock receipts all showed that it was the bill of lading of the Fulton Steamship Corporation that was to be furnished. The fact that the Capitaine Faure was a chartered vessel did not appear in the advertisements, and the shippers who dealt directly with the Fulton Steamship Corporation do not appear to have had any notice of that fact; but in the cases where the arrangements were made with the Fulton Steamship Corporation through shipping brokers, it is hard to believe that those brokers did not know that the vessel was a chartered vessel.

[2] The acts of 1910 and 1920 did not impose upon the shipper the duty of inquiring as to whether the ship was chartered or owned by the Fulton Steamship Corporation, nor the terms of the charter party; but, if actual knowledge of the terms of the charter had been brought home to any of the shippers, they would be bound by that notice (Armour & Co. v. Fort Morgan S. S. Co., Ltd. [C. C. A.] 297 Fed. 813), even if the bill of lading was signed by the master.

[3] The ship was not bound by the bills of lading signed by the Fulton Steamship Corporation, as they were without power to bind the ship. The Esrom (C. C. A.) 272 Fed. 266. Aktieselskabet Bruusgaard v. Standard Oil Co. of New Jersey (C. C. A.) 283 Fed. 106.

[4, 5] As to the original bills of lading, signed by the master of the ship and delivered to the Steamship Corporation, and in the case where the master by letter to the shipper ratified the act of the Steamship Corporation in signing the bill of lading, a different rule applies, because the bills of lading make no reference to the charter party, and when signed and delivered to the shipper became the contract and bound the ship. In my opinion this is not the rule, however, if the Steamship Corporation's bill of lading had been signed by it and delivered to the shipper, and thereafter the Steamship Corporation had induced the master to sign a further bill of lading, because in such case there was no reliance on the security of the ship by the shipper at the time of shipment, but the reliance was wholly on the credit of the corporation, and the act of the corporation in inducing the master to sign a further bill of lading was for the benefit of the corporation in an attempt to reduce its liability, and the corporation would be bound by its knowledge of the terms of the charter party; and as the corporation under such circumstances would, in so far as the shipper might be benefited, be acting as the shipper's agent, the shipper would be chargeable with the knowledge of the Steamship Corporation. The looking casually by the master at the bills of lading issued by the company before the ar-

rival of the ship, even if he said they were "all right," was not a ratification of the acts of the corporation which bound the ship.

There is no direct provision of the charter party requiring the master to sign bills of lading, but that he had the power and was expected to exercise it appears from the fact that the charterer agreed in the charter party to indemnify the owner against such acts. The case at bar is clearly distinguishable from The Sprott Case (D. C.) 70 Fed. 327, in which case the master was present at the times that the bills of lading were signed, and the "charterers acted in the immediate presence of the master, and scarcely otherwise than as his amanuenses," while in the instant case many of the bills of lading were signed by the corporation before the arrival of the ship.

[6] As to the bills of lading containing the indorsement "on board," even if signed by the master, if in any case the goods were not actually on board at the date of the bill of lading, the same were signed in violation of law, and the master was without authority to bind the ship by such illegal action, except in so far as she might be liable to the penalty provided for the violation of that law (The Isola Di Procida [D. C.] 124 Fed. 942); and in my opinion The Sark (D. C.) 245 Fed. 909, does not lay down a different rule, because in that case recovery was sought by the owner of the ship against the charterer for damages which had been imposed on the ship in a foreign port, because of false bills of lading signed by a representative of the charterer, with the consent of the master, and the court held that the verdict of the foreign court was conclusive, and the question of the owner's liability for the illegal act of the master was beside the mark.

[7] The "on board" indorsement on the bills of lading was intended to show the date they were loaded (Vietor v. National City Bank, 200 App. Div. 557, 193 N. Y. Supp. 868), and if no date is given as to the indorsement, then the date of the bill of lading should be taken as the date of the indorsement, as the date the goods are "on board" is of great importance in many cases in determining the rights of the shipper and consignee, as was shown in the case at bar.

On the 9th day of May, 1923, the payment of the monthly sum for the charter hire of the steamship was due and was not paid, and thereafter on the 10th day of May, 1923, the master of the ship notified the charterer of the withdrawal of the ship from charter party and to discharge the cargo, or on his default steps would be taken to discharge the same at his expense. After some conferences the ship discharged the cargo and delivered the same to the shippers.

[8] As to all cargo not covered by legal original bills of lading or the letter signed by the master, the ship was not bound to carry the same on the default of the charterer in payment of the charter hire. The Esrom, supra; The Devona (D. C.) 272 Fed. 275. Had the ship broken ground and commenced the voyage, a different rule would be applied, and the ship would have been obliged to carry the cargo to a port stated in the bill of lading. The ship, of course, was liable for the proper stowage of the cargo, and for any loss of cargo on the ship or damage caused in discharging the cargo.

[9] As to all the cargo on which the freight was prepaid, the money had never come into the hands of the owner, and no recovery thereof could be had against the ship or its owner.

[10] As to all the cargo which I have held that the ship was obliged to carry to the port called for in the bill of lading, and which she failed to carry, in my opinion the damages due to loss of market should be measured by the difference between the market value of the goods at the time the Capitaine Faure should have arrived at her respective unloading ports in China and Japan, had she sailed in the ordinary course after completing her loading, and the market value of the same goods here in New York at the time when they were delivered back to the shippers. The length of voyage can be figured at between 50 and 60 days, and complete loading was not accomplished until May 9th.

No proof was offered, so far as I have found, as to what was the reasonable time in which the ship should have sailed, but it could not have been earlier than May 9th. The rule above set forth should be followed, unless it be shown that there was no market for any particular line of goods at destination. As to such cargo, of course, physical damage which occurred upon the ship or in discharging must be allowed, and the cost of removing the goods, and the additional freight.

[11] The respondents Reuben I. Cameron and Fulton Steamship Corporation were not acting as agents for the ship, and are liable

to all the shippers who have suffered damages, and who are represented by the libelants in the two above-entitled actions.

A decree may be entered in favor of the libelants against all the respondents, as indicated in this opinion, with costs, and with an order of reference to take further proof as to the facts in these cases as may be necessary under this opinion, and to assess the damages.