## DIXON, IRMAOS & CIA. Ltda., v. CHASE NAT. BANK OF CITY OF NEW YORK.

### No. 374.

Circuit Court of Appeals, Second Circuit.

Sept. 12, 1944.

Bigham, Englar, Jones & Houston, of New York City (Oscar R. Houston and J. Joseph Noble, both of New York City, of counsel), for appellant.

Mudge, Stern, Williams & Tucker, of New York City (George L. Trumbull and Randolph H. Guthrie, both of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and FRANK, Circuit Judges.

SWAN, Circuit Judge.

This appeal raises interesting and important questions as to letters of credit covering C. I. F. shipments abroad. The plaintiff, an exporter of cotton in Sao Paulo, Brazil, contracted to sell cotton to a purchaser in Belgium. A Belgian bank requested the Chase Bank to issue in favor of the plaintiff two irrevocable letters of credit for $7,000 and $3,500 respectively to finance such sales. Chase Bank did so and mailed them to Sao Paulo, where they were received by the plaintiff on May 2, 1940. They bound Chase Bank to honor 90 day drafts drawn under the credits, if presented at its office on or before May 15, 1940 and accompanied by specified documents, including a "full set of bills of lading" evidencing shipment of a stated quantity and quality of cotton "C. I. F. Ghent/Antwerp." One of the letters of credit (both being the same in form) is set out in the margin.[1] The plaintiff duly shipped the cotton to its Belgian customer in two lots, receiving for each shipment two originals

---

[1] "The Chase National Bank
of The City of New York
                    "April 8, 1940.
"Confirmed Irrevocable Straight Credit
"Dixon Irmaos and Cia. Ltda.,
"Sao Paulo, Brazil
"Gentlemen:
"We are instructed by Banque de Bruxelles, S. A., Brussels, Belgium to advise you that they have opened their irrevocable credit in your favor for account of by order of Georgie Alost under their credit Number 40466 for a sum or sums not exceeding a total of About $7000.00 (Seven Thousand Dollars) U. S. Currency available by your drafts on us at 90 days sight, in duplicate to be accompanied by

"Commercial invoice in triplicate, or invoice copy

"Insurance certificate which must cover land and sea risks into the mills, and showing merchandise covered onboard the steamer named and/or other steamer or steamers

"Full set bills of lading. Port or custody bills of lading acceptable evidencing shipment of 22 tons Bresilian Sao Paulo Cotton type MINI shipped during April 1940, CIF Ghent/Antwerp

"All documents in name of La Georgie.
"All drafts so drawn must be marked

of the bills of lading. Instead of prepaying freight the plaintiff shipped the goods freight collect and deducted the freight charges from the invoice price. Through the Guaranty Trust Company of New York, the plaintiff's representative, drafts and documents were presented to Chase Bank on May 15, 1940, but only one of the set of two bills of lading was delivered. In lieu of the other, which was in the mail and not yet arrived in New York, an indemnity agreement or guaranty against loss resulting from its absence was tendered by the Guaranty Trust Company.[2] Chase Bank had no objection to the form of the guaranty or to the responsibility of the guarantor, but it refused the drafts on two grounds: (1) Absence of a full set of the bills of lading and (2) failure to prepay the freight. The plaintiff then brought the present action to recover the amount of its drafts, $5,587.15 under the larger letter of credit and $2,757.49 under the smaller. The case was tried without a jury. At the conclusion of the evidence each side moved for judgment. Decision being reserved, the district judge thereafter rendered an opinion and filed findings of fact and law. He gave judgment for the defendant on the ground that the tender of less than a full set of bills of lading did not comply with the terms of the letters of credit.

Assuming for the moment that a C. I. F. shipment does not require the shipper to prepay freight if the freight charges are credited against the invoice price, the Guaranty Trust Company's tender to Chase Bank of drafts and documents fully met the requirements of the letters of credit, except for the fact that one original bill of lading out of each set of two was missing. The plaintiff contends that this fact did not defeat the adequacy of its tender because the evidence established the existence of a custom among New York banks issuing letters of credit to finance a shipment from outside the United States and calling for a "full set of bills of lading", to accept in lieu of a missing part of the set a guaranty by a responsible New York bank against any loss resulting from the absence of the missing part. On this subject the trial judge made the following findings of fact:

"12. The letters of guaranty of the Guaranty Trust Company tendered to the defendant are in the usual form of guaranties tendered by and accepted by leading New York Banks issuing commercial credits, when less than all bills of lading are presented under credits calling for a full set of bills of lading.

"12A. The Guaranty Trust Company was and is a prime and leading New York bank with sound financial standing.

"12B. The defendant raised no objection to the form of the guaranties tendered by the Guaranty Trust Company nor with the financial responsibility of the Guaranty Trust Company.

"13. On May 15, 1940, and for some time prior thereto, there existed a general and uniform custom among New York banks, exporters and importers to the effect that in lieu of a missing bill or missing bills of lading presented under credits calling for a full set of bills of lading, that the bank issuing the credits would accept in lieu of the missing bill or bills of lading, a guaranty of a leading New York bank, if it determined the guaranty to be satisfactory in form and if it was satisfied as to the responsibility of the bank issuing the guaranty. The bank issuing the credit was, however, free to exercise its own discretion and make its own determination as

---

'Drawn under Chase National Bank Credit No. E71582'

"The above mentioned correspondent engages with you that all drafts drawn under and in compliance with the terms of this credit will be duly honored on delivery of documents as specified if presented at this office on or before May 15, 1940; we confirm the credit and thereby undertake that all drafts drawn and presented as above specified will be duly honored by us.

"Unless otherwise expressly stated, this credit is subject to the uniform customs and practice for commercial documentary credits fixed by the Seventh Congress of the International Chamber of Commerce and certain guiding provisions.

"Yours very truly,
"C. F. Wellman
Assistant Manager
"F. N. Powelson
Assistant Cashier"

[2] The Guaranty Trust Company's indemnity agreement stated:

"In consideration of your accepting the above described draft, we hereby agree to hold you harmless from any and all consequences which might arise due to the following discrepancy:

"Only 1 copy presented out of a set of 2 bills of lading issued.

"It is understood that this guarantee

to whether it would accept a guaranty in lieu of a missing bill of lading."

We are not entirely clear as to the meaning of the final sentence of finding 13. If it means that the issuer of credit is free to reject the tendered guaranty if doubts are entertained regarding the guarantor's financial responsibility or the sufficiency of the form of the document, it is not inconsistent with the custom stated in the first sentence and may be disregarded; in these respects Chase Bank was satisfied with the guaranty tendered by Guaranty Trust Company. But if it means that even when so satisfied the bank issuing the credit may reject the tendered guaranty and refuse to accept the draft, it is inconsistent with the stated custom and is unsupported by the evidence. Numerous witnesses, experts in the fields of banking and of commerce, testified to the existence of the custom; not one testified to a single instance where a tender such as was here made had been rejected and the draft dishonored solely on the ground that the set of bills of lading was incomplete. Indeed, it is clear that the Chase Bank would in this very case have honored the drafts, had they been presented before the German invasion of Belgium. One of its witnesses naively said that before May 15, 1940 it was the custom to accept such a guaranty as was tendered, but not on that date or thereafter— as though the determining moment were not at the latest when the plaintiff acted upon the letters of credit. In short, the existence of the custom was established beyond dispute.

■ It is true, as the defendant argues, that the law requires strict compliance with the terms of a letter of credit. International Banking Corp. v. Irving Nat. Bank, 2 Cir., 283 F. 103. It is likewise true that numerous cases, several of which are cited by the defendant, declare that evidence of a custom is not admissible to contradict the unambiguous terms of a written contract. DeWitt v. Berry, 134 U.S. 306, 312, 10 S.Ct. 536, 33 L.Ed. 896; Transatlantic Shipping Co. v. St. Paul F. & M. Ins. Co., 2 Cir., 9 F.2d 720, 723; Hopper v. Sage, 112 N.Y. 530, 535, 20 N.E. 350, 8 Am.St.Rep. 771; Green v. Wachs, 254 N.Y. 437, 441, 173 N.E. 575. But it is also well settled "that parties who contract

on a subject-matter concerning which known usages prevail, incorporate such usages by implication into their agreements, if nothing is said to the contrary." Hostetter v. Park, 137 U.S. 30, 40, 11 S.Ct. 1, 4, 34 L.Ed. 568. See also Nicoll v. Pittsvein Coal Co., 2 Cir., 269 F. 968, 972; Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, D.C.S.D.N.Y., 299 F. 991; Vietor v. National City Bank, 200 App.Div. 557, 193 N.Y.S. 868; Id., 206 App.Div. 664, 199 N.Y.S. 955, affirmed 237 N.Y. 538, 143 N.E. 733; Mutual Chemical Co. v. Marden, Orth & Hastings Co., 235 N.Y. 145, 151, 139 N.E. 221; Williston, Contracts, rev. ed. §§ 650, 652, 1081A. In our opinion the custom under consideration explains the meaning of the technical phrase "full set of bills of lading" and is incorporated by implication into the terms of the defendant's letters of credit. No authority on the precise point has come to our attention. The statement of Bankes, L. J. in Scott & Co., Ltd. v. Barclay's Bank, Ltd., [1923] 2 K.B. 1, 11, upon which the defendant relies, is inapposite because no custom such as the court found here was there proved or attempted to be proved. Finally, the defendant urges that the reference in the concluding paragraph of the letters of credit to the uniform customs and practice for commercial documentary credits fixed by the Seventh Congress of the International Chamber of Commerce excludes incorporation into the contracts of any other custom. We do not think so. Those customs do not deal with the meaning of a "full set of bills of lading." Hence the problem whether the New York custom gives meaning to those words is unaffected by the reference to those other customs. The reasonableness and utility of the local New York custom is obvious. It is absolutely essential to the expeditious doing of business in overseas transactions in these days when one part of the bill of lading goes by air and another by water. Unless an indemnity can be substituted for the delayed part, not only does quick clearance of such transactions become impossible but also the universal practice of issuing bills of ladings in sets and sending the different parts by separate mails loses much of its purpose. We conclude therefore that the defendant's first ground for dishonor of the drafts was not a valid reason.

will remain in force until such time as you may obtain a release from your clients.

"We shall thank you to take the neces-

sary steps to obtain this release as soon as possible and inform us promptly when it has been obtained."

The second ground for dishonor was that while the credits specified a C. I. F. shipment, the plaintiff deducted freight charges from the invoices and shipped the goods freight collect. On this subject the court made the following findings:

"15. The ordinary and accepted meaning of a c. i. f. contract is that the contract price includes the cost of the goods, the cost of insurance and the cost of freight to the point of destination. The term does not imply the time when or the place where the freight is to be paid and there was no uniform practice in New York on May 15, 1940 or prior thereto of prepaying freight to the point of destination under a c. i. f. shipment. The practice was that it was sometimes prepaid and sometimes deducted from the invoice.

"16. The 'American Foreign Trade Definitions' are incorporated by reference in the letters of credit and such definitions, including the definition of a c. i. f. contract, is a part of the credit. Under the definition of a c. i. f. contract as defined in 'American and Foreign Trade Definitions' there is no requirement that a shipper must prepay freight.

\*    \*    \*    \*    \*

"18. The tender of documents showing a deduction of freight from the invoices was not a deviation from the requirement of defendant's credits calling for C. I. F. shipment."

We agree with this conclusion. In the case of a sight draft, it is wholly immaterial to the buyer whether freight is prepaid or credit given on the invoice price. In the case of a time draft, it is true that the buyer may be deprived of the credit period as to part of the purchase price, that is, so much of it as the freight amounts to. In the case at bar the freight was $1359.-14. The measure of any possible loss to the buyer is the interest upon this sum for the period between arrival of the goods and the date the drafts would fall due and the possible inconvenience of being called upon for early payment in cash of this portion of the price. The bills of lading were endorsed "on board" on May 5th and, if we assume the voyage would take 30 days, the buyer would not be called upon for the freight until June 5th. The draft if accepted on May 15th would have been due 90 days later, that is, the buyer would have had to pay freight about 70 days earlier than he would otherwise have paid such sum. Interest at 6% would amount to about $17. On a transaction involving about $9,700 such a sum is insignificant. The law has not cut so fine. The point of possible inconvenience is taken care of by ancient usage. The seller has so long had the option of shipping either freight collect or freight prepaid that the cases recognize the option as part of the standard meaning of the term C. I. F., making no distinction between prepayment or shipping freight collect and crediting it on the invoice irrespective of whether the draft be time or sight. See Ireland v. Livingston, L.R. 5 H.L. 395, 406; Thames & Mersey Ins. Co. v. United States, 237 U.S. 19, 26, 35 S. Ct. 496, 59 L.Ed. 821, Ann.Cas.1915D, 1087; Warner Bros. & Co. v. Israel, 2 Cir., 101 F. 2d 59, 60. As the court pointed out in finding 16 the American and Foreign Trade definitions provide that under a C. I. F. contract the seller must pay the freight but make no mention of prepayment. Furthermore, if the buyer sells the documents before arrival of the goods, as frequently hapens in C. I. F. transactions, whether freight was prepaid will be wholly immaterial to him.

The judgment for the defendant is reversed and judgment directed in favor of the plaintiff.