NORTHERN INDUSTRIAL CHEMICAL COMPANY *vs.* DIRECTOR GENERAL OF RAILROADS.

Suffolk.   March 3, 1924. — May 23, 1924.

Present: RUGG, C.J., BRALEY, DeCOURCY, CROSBY, & CARROLL, JJ.

*Carrier*, Of goods: successive carriers. *Evidence*, Presumptions and burden of proof, Competency, Cumulative. *Practice, Civil*, Exceptions: harmless error.

At the trial of an action against the director general of railroads by the consignee of a shipment of goods from Seattle in the State of Washington to Boston, transhipped to West Barrington in the State of Rhode Island, to recover for loss, alleged to have occurred on the system of the New York, New Haven and Hartford Railroad of a part of a shipment of castor oil, the jury found for the plaintiff. There was some evidence that the loss occurred before the shipment reached that system. *Held*, that the burden was on the defendant to show that the cause of the loss was something for which he was not responsible, and, as the evidence relating to loss before the shipment reached the system of the terminal carrier did not need to be believed by the jury, there was no error in a refusal by the trial judge to direct a verdict for the defendant.

In the action above described, it was *held*, that an agreement of counsel for the parties as to the amount for which a verdict, if found for the plaintiff, should be returned, rendered it unnecessary to determine the percentage of leakage which occurred before the shipment reached the system of the terminal carrier.

At the trial of the action above described, it was not error to admit evidence tending to show the meaning of the words, " clean bill of lading," in a bill of lading of the uniform standard form, and explaining a provision therein as to the absence of " exceptions."

At the trial of the action above described, it appeared that a dock foreman in Seattle in the State of Washington had made an affidavit at the date of shipment that he found barrels containing the shipment in first

class condition when loaded, and also properly dunnaged. As a witness at the trial, he stated that he then had no present recollection of those facts as stated in the affidavit, but that, when he made the affidavit, the statements therein were true. On examination of the affidavit, he stated as a fact that the barrels were properly dunnaged, and, subject to an exception of the defendant, the affidavit was admitted in evidence. *Held,* that the exception must be overruled since, even assuming that there was error in admitting the affidavit in evidence, or the testimony relating to its contents, such evidence was merely cumulative and did not affect the substantial rights of the defendant.

The shipment which was the basis of the action above described was made in 1918. Testimony of various witnesses at the trial, offered by the defendant to prove that in 1923 the practice was to use metal containers for the goods in question and that they were considered better than wood, was *held* properly to have been excluded, in some instances because the witnesses were not qualified as experts to the satisfaction of the trial judge, and chiefly because the shipment was accepted by the defendant in wooden barrels loaded in tiers; and also because there was evidence that during the period of the World War the railroad administration requested loading to capacity or double loading. ·

The purchaser of a negotiable bill of lading has a right to rely on a statement in that bill that the shipment was received " in apparent good order."

TORT OR CONTRACT for damages resulting from destruction in transit of a shipment of one hundred barrels of castor oil from Seattle in the State of Washington to Boston in this Commonwealth and West Barrington in the State of Rhode Island. Writ dated May 15, 1919.

In all counts of the declaration, it was alleged that " the plaintiff, at the request of " the initial carrier in the State of Washington delivered the shipment to it " in good order and condition to be taken care of and to be safely and securely conveyed by said carrier and by connecting carriers to said Boston, and there by the New York, New Haven and Hartford Railroad Company, the terminal carrier, to be delivered in like good order and condition to the order of Gaston, Williams & Wigmore; " and that at Boston the goods were reconsigned to West Barrington, Rhode Island. The first count of the declaration was based on alleged negligence of the defendant as final carrier in control of the New York, New Haven and Hartford Railroad. In the second and third counts all the railroads from the first to the last of the transportation were treated as operated as one system by the

defendant without a specification as to where the negligent act operated.

In the Superior Court, the action was tried before *Raymond,* J. Material evidence is described in the opinion. It appeared that the bill of lading of the shipment was an " order bill of lading " and acknowledged receipt of goods by Drummond Lighterage Company " in apparent good order, except as noted; " that the goods were stated therein as " consigned to the order of Gaston, Williams & Wigmore " with destination stated as " South Boston . . . Notify Northern Industrial Chemical Co." The bill of lading was indorsed by Gaston, Williams and Wigmore, Incorporated, N. B. Cook Oil Company, and Northern Industrial Chemical Company.

The plaintiff's president testified that the plaintiff purchased the oil from N. B. Cook Oil Company, and sold it through N. S. Wilson Company to the O'Bannon Corporation. The oil was shipped from Seattle under an order or negotiable bill of lading, which was sent to a Boston bank with a draft attached. This draft he paid on August 19, 1918, taking up the order bill of lading. He then sent the original bill of lading, to which he attached the plaintiff's draft on the O'Bannon Corporation, to Providence for collection. The O'Bannon Corporation never paid the draft, and he later took up the bill of lading and surrendered it to the carrier at West Barrington in order to get delivery of the oil.

Details of testimony on prices were stated in the bill of exceptions not to be material " because it was agreed by counsel that the value of the oil, which represented the difference between the weight as testified to on behalf of the plaintiff and shown in the exhibits as the weight at point of shipment and the weight as secured [at West Barrington] by the witness Clancy on September 24, 1918, was $3,380."

Other material evidence is described in the opinion. The defendant moved for a verdict in his favor. The motion was denied. The defendant then asked for the following rulings:

" 1. There is no evidence proper for submission to the jury as to what quantity of oil was shipped at Seattle.

" 2. There is no evidence that barrels were proper or suit-

able containers for a shipment in the summer of castor oil from Seattle to Boston.

" 3. There is no evidence that in loading the shipment in the car proper precautions were taken by bracing with wood or otherwise so as to prevent movement of the barrels during ordinary transportation by rail from Seattle to Boston.

" 4. There is no evidence of any damage caused to the shipment while in the possession of the carriers, due to rough handling, accident, collision, or to any other cause for which the carriers would be liable."

" 7. The defendant is sued for an alleged responsibility of the United States Railroad Administration arising out of its operation of the railroad of the New York, New Haven and Hartford Railroad Company, and is not responsible under count one for any liability or responsibility which may exist or have existed in connection with the movement of the car in question before its delivery at Boston by the Boston and Albany system.

" 8. The plaintiff cannot recover in this action for any liability of the United States Railroad Administration arising out of its operation of any railroad except that of the New York, New Haven and Hartford Railroad.

" 9. If you find that in the transportation of the car at some point or points between Seattle and Boston, the barrels were caused to leak or damaged by some carrier by an act or omission to act for which such carrier would be liable, then the defendant is not liable in this action for any such damage or loss.

" 10. If you find that at Spaulding, Illinois, and at Buffalo, New York, and at Springfield, Massachusetts, or at one or more of said places, said oil was found to be leaking, or to have leaked, then the defendant is not liable in this proceeding for any loss which had occurred before the car came into the possession of the New York, New Haven and Hartford Railroad.

" 11. If you find that at Spaulding, Illinois, and at Buffalo, New York, and at Springfield, Massachusetts, or at one or more of said places, said oil was found to be leaking, or to have leaked, the defendant is not liable in this action for any

further loss if any which resulted from causes which produced the original leaking, nor liable for any further loss from leaking which was not caused by some new and independent act or failure to act on the part of the carrier operating the New York, New Haven and Hartford Railroad.

" 12. If you find that at Spaulding, Illinois, and at Buffalo, New York, and at Springfield, Massachusetts, or at one or more of said places, said oil was found to be leaking, or to have leaked, then the plaintiff cannot recover in this proceeding without showing the quantity of oil which was in the barrels and in such barrels as were proper containers, at the time when the car came upon the New Haven system.

" 13. There is no evidence what quantity of oil was in the barrels and in such as were proper containers at the time the car came upon the New Haven system.

" 14. If you find that in the circumstances, considering the length of haul, the season of the year, the length of time reasonably required to move the car from Seattle to Boston, the probable temperatures to be encountered, and any other factor or factors which should be considered, the use of wooden barrels was not proper, then the plaintiff cannot recover.

" 15. If you find that before the car reached the New Haven system it was, or had been, leaking to a substantial amount, then there is no presumption in favor of the plaintiff that any loss or damage which occurred was caused by the last carrier (i.e., the New Haven system).

" 16. If you find that any loss of oil occurred at West Barrington between the time when the car might with reasonable promptness have been unloaded on arrival and the date on which the barrels were weighed, the plaintiff can in no event recover for such loss.

" 17. During the period of government control of railroads the President of the United States operated the several systems of railroad through a Director General, and they were operated as separate and distinct entities, and not as one complete system.

" 18. During government control the Director General while operating one railroad system was not responsible in that capacity or by virtue of that office for any liability

incurred by him while operating any other separate and distinct railroad system.

" 19. During government control or as a result thereof shippers or consignees of freight had no greater or broader rights of action for loss or damage than they would have had if the railroads had not been taken over by the government."

The judge in his charge to the jury stated " that the case has been tried by both parties on two theories, alternative theories we may say; one, under the first count as we have called it, that the New Haven road as the ultimate carrier is liable under an old theory of the common law which raises the presumption that the final carrier is the one that is responsible if there be a loss in the carriage. The other theory is that when the United States government took over the railroads, took control of the road for its own purpose, growing out of the great emergency and dire necessity of a few years ago in the time of the great war, by its taking over all of the transportation systems of the country it made them for this purpose a unified or a single system of roads, so that it was when one shipped goods at Seattle, for instance, to be carried from the Pacific coast to the Atlantic coast, it was just the same as if it was shipping over a single road that went from coast to coast, a uniform, — a unit system, a single system under a single definite control, each road and the officers and agencies of each road and the employees of each road being subject to a single will, and the dominating will centering at Washington and directing the whole tangled network and making it a single purpose for the great purpose that it had in view."

On the second theory above stated, the judge charged the jury " that when goods go in good condition, without fault properly into the hands of the common carrier the duty rests upon the carrier safely to transport them and to deliver them undamaged in good order to their destination, so that you are not to require in this case that the plaintiff shall prove that those goods were damaged, if they were damaged, by the fault of the company. The company assumes the burden which is recognized in the law of proving that it was not

its fault. . . . If the loss was the fault of the shipper himself, if the loss was due to the inherent character of the goods themselves so that loss was incidental to the shipment and carriage of the goods and in no wise caused by fault on the part of the carrier, the carrier ought not to be held for it, but you will take into your consideration the presumptions that have been raised in the case, the duty of the common carrier to carry safely and deliver in good order and it will be for you to say whether the defendant has shown that it was not liable for the loss that occurred from the time that the goods went on board at Seattle until the car was opened at West Barrington."

On the first theory above described, the judge charged the jury as follows: " In that case . . . when the oil was put on board at Seattle, by a law that was made a few years ago, the initial carrier, the original carrier, there was a presumption against it if there was a loss and by the decisions of the Massachusetts Supreme Judicial Court there is a presumption that arises against the final carrier which would be in this case the New Haven Railroad Company and in order that this case may properly go to the higher court I want you gentlemen to determine whether the loss, if there was a loss, took place back of the New York and New Haven system, whether that has been shown or whether it took place on the New York and New Haven system. The first count in the declaration raises that question. It is drawn to meet the case where the loss occurred on the New York and New Haven system, and therefore I want you to pass on the counts separately and the verdicts will be put into your hands by the clerk in order that you may do that. First, whether or not you find under the first count of the declaration that the loss occurred on the New York and New Haven system."

The judge further charged the jury: " In either case, in all the counts if you find for the plaintiff your verdict is $3,380 by their agreement or nothing if you find for the defendant, and you will return the verdicts in their ordinary forms, but on the separate counts in order that the question may be raised for the higher court."

There was a verdict for the plaintiff on each count of the

declaration in the sum of $3,380.  The defendant alleged exceptions.

*A. W. Blackman,* for the defendant.

*L. B. King,* for the plaintiff.

DeCourcy, J.   The plaintiff, purchaser of a carload of castor oil, brought this action to recover damages to the shipment while it was in transit from Seattle, Washington, to West Barrington, Rhode Island, where it arrived on September 16, 1918, in a leaky condition.   The declaration is in three counts, for one and the same cause of action. The first is against the Director General, based on his operation of the New York, New Haven and Hartford Railroad, the terminal carrier.   The second and third in substance are against the United States Railroad Administration on the theory that there was but a single common carrier from the shipping point to the place of delivery.   The jury returned a verdict for the plaintiff on the first count in the sum of $3,380, and in the same amount on counts 2 and 3. The defendant's exceptions are to the refusal of the trial judge to direct verdicts in his favor, and to give certain requested rulings; to the admission and exclusion of testimony; and to certain portions of the charge.

1. The separate verdict for the plaintiff on the first count, especially in view of the instructions of the court, fixes the injury as occurring on the New York, New Haven and Hartford, the terminal road.   Accordingly the question of directing a verdict on counts 2 and 3 has become moot; and it is unnecessary to consider whether the federal control resulted in merging the several railroad systems into a single common carrier unit, or whether they were operated as separate and distinct entities.   And see *Davis* v. *Donovan,* 265 U. S. 257.

As to the first count: There was evidence from which it could be found that the one hundred barrels, in which the oil was sent, were proper containers for oil shipments; that the barrels when loaded were in fit condition, were properly dunnaged or braced in the car, and passed upon by the checker of the railroad company; and that a " clean bill of lading " was issued, reciting that the goods were in " apparent good order."   On arrival at West Barrington, according to

the evidence, two of the barrels had broken heads and seven were in pieces " with the staves busted," — these nine barrels being empty: the dunnage, or bracing and wooden supports, was broken down; and there was oil on and underneath the car.   There was affirmative evidence, in addition to the presumption, that the serious harm occurred on the lines of the terminal carrier.   *Moore* v. *New York, New Haven & Hartford Railroad,* 173 Mass. 335.   *Cote* v. *New York, New Haven & Hartford Railroad,* 182 Mass. 290.   *Bullock* v. *Haverhill & Boston Dispatch Co.* 187 Mass. 91.   *Shapiro* v. *Boston & Maine Railroad,* 213 Mass. 70.

The burden was on the defendant to show that the cause of the loss was something for which he was not responsible, *Hastings* v. *Pepper,* 11 Pick. 41, *L. L. Cohen & Co. Inc.* v. *Director General of Railroads,* 247 Mass. 259.   He did offer testimony tending to show that some oil leakage was observed at Spaulding, Illinois, East Buffalo, New York, and West Springfield, Massachusetts. But under the established rule of *Lindenbaum* v: *New York, New Haven & Hartford Railroad,* 197 Mass. 314, the jury could reject or accept that testimony.   Even if they believed it in whole or in part, the employees on the New Haven road, after being notified of the leaks by the notations on the way bill, accepted the shipment from the preceding carrier, and should have taken all necessary precautions to prevent further damage from there on.   In short, as the plaintiff had established the common law presumption against the terminal carrier, and the burden was on the defendant to show facts that would relieve him from liability, on this record there was no error in the refusal of the trial judge to direct a verdict for the defendant on the first count.   *Hannibal Railroad* v. *Swift,* 12 Wall. 262. *Chicago & Northwestern Railway* v. *Whitnack Co.* 258 U. S. 369.   *Atlantic Coast Line Railroad* v. *Rice,* 169 Ala. 265. *Paramore* v. *Western Railroad,* 53 Ga. 383.   *Wabash Railroad* v. *Priddy,* 179 Ind. 483.

2. Of the twenty-six rulings requested by the defendant, those numbered 5 and 6 were given, and the last seven are expressly waived.   The others are not specifically argued, so we treat the subject matter thereof briefly.   As regards

the quantity of oil shipped at Seattle, there was not only the record of the certified weighers, Core and Herbert, but the bill of lading acknowledging the receipt of forty-five thousand seven hundred seventy pounds of castor oil: the cars were scaled before leaving Seattle to obtain the transcontinental weight; and the way bill indicates that the shipment was weighed by the carrier and found to be forty-six thousand three hundred eighty pounds, or six hundred ten pounds greater than the plaintiff claimed. There was ample evidence that wooden barrels were suitable containers for oil shipments, and that they were properly dunnaged. As to requests 8, 9, 10, 12 and 13, dealing with the loss on lines other than the New Haven, as already stated the burden was on the defendant to prove that the damage was one for which he was not responsible. And the agreement of counsel that the amount of the verdict should be $3,380, if the jury should find for the plaintiff, rendered it unnecessary to determine what amount of leakage occurred on the connecting lines. The same is true, in addition to other grounds, of request 16. An examination of all the requests discloses no reversible error in the failure to give them, so far as they were not given in substance in the charge.

3. There were numerous exceptions to evidence. We treat only those argued by the defendant, and not hereinbefore considered. The words " clean bill of lading," being a technical expression of the trade, it was not error to admit the testimony of experts to interpret the phrase. The same is true as to the absence of " exceptions " in the bill of lading. The witness Davis, dock foreman at Seattle, had made an affidavit at the time of the shipment, that he found the barrels in first class condition when loaded, and also properly dunnaged. Although he had no present recollection of these facts as stated in the affidavit, he testified that when he made the statements they were true. Later, on looking at the affidavit, he stated as a fact that the barrels were properly dunnaged. It seems to us that the affidavit itself was not admissible, although the testimony of the witness, that the statements therein as to the dunnage were truthfully made when his recollection was refreshed, seems to come within

cases like *Cumberland Glass Manuf. Co.* v. *Atteaux,* 199 Mass. 426, and *Gurley* v. *Springfield Street Railway,* 206 Mass. 534. In any event, the testimony and affidavit were only cumulative evidence. The carrier was free to refuse this shipment if not satisfied with the condition of the lading; and having accepted it, and issued a clean bill of lading, it assumed the usual obligations of a carrier. *L. L. Cohen & Co., Inc.* v. *Director General of Railroads, supra.* In other words, even assuming that there was error in admitting the affidavit, or the testimony relating to its contents,. it did not affect the substantial rights of the defendant. G. L. c. 231, § 132. *Batchelder* v. *Home National Bank of Milford,* 218 Mass. 420. *Noyes* v. *Noyes,* 224 Mass. 125. *Duggan* v. *Bay State Street Railway,* 230 Mass. 370, 383. The testimony offered by the defendant, that in 1923 the practice was to use metal containers, and that they were considered better than wood, was properly excluded, in some instances, because the witnesses were not qualified as experts to the satisfaction of the trial judge. And generally, the shipment in question was in July, 1918; it was accepted by the defendant in wooden barrels, loaded as they were in tiers. Indeed it was in evidence that during the war period the railroad administration requested loading to capacity, or double loading. Finally, it is to be borne in mind that the plaintiff, as purchaser of a negotiable bill of lading, had a right to rely on the recital therein that the shipment was received " in apparent good order."

An examination of the entire record discloses no reversible error in the admission or exclusion of evidence.

*Exceptions overruled.*