**BANK OF AMERICA NAT. TRUST &
SAVINGS ASS'N v. LIBERTY NAT.
BANK & TRUST CO. OF OKLAHOMA
CITY.**

Civ. No. 5181.

United States District Court
W. D. Oklahoma.

Oct. 17, 1953.

plaintiff in transactions centering around a commercial letter of credit issued by Liberty to the plaintiff.

The original letter of credit was issued by Liberty to Bank of America at the request of Liberty's customer, Anderson-Prichard Oil Corporation; this customer wished to purchase quantities of oil well casing and tubing located in Europe through a United States importer, one Tegtmeyer. The irrevocable, commercial letter of credit was transmitted to the plaintiff on December 15, 1950; the plaintiff, in turn, issued its own irrevocable letter of credit[2] to the Union Bank of Switzerland at Geneva, Switzerland,[3] on December 20, 1950.

A number of amendments were made to the original letter of credit by wire and letter before the two shipments of the materials and the negotiation of the two drafts in connection with the sales took place.

Plaintiff's cause of action is pitched upon two separate and independent theories. First, plaintiff is entitled to recover $124,223.05 and $70,611.47, plus appropriate interest, the amounts of two drafts drawn under this letter of credit, which drafts were refused payment by Liberty; or, second, and alternatively, plaintiff is entitled to recover a lesser sum based upon an implied contract for money paid out by Bank of America to the Swiss bank by virtue of Liberty's express request and direction.

Richardson, Cochran, Dudley, Fowler & Rucks, Oklahoma City, Okl., Kenneth M. Johnson, San Francisco, Cal., for plaintiff.

V. P. Crowe and John W. Swinford, Oklahoma City, Okl., for defendant.

WALLACE, District Judge.

The plaintiff, Bank of America, brings this action to recover a money judgment over against the defendant, the Liberty National Bank[1] of Oklahoma City, for a pecuniary loss allegedly sustained by

I

What Liability Exists in Relation to the Two Drafts Drawn Under the Letter of Credit?

Fundamentally, the letter of credit, as amended, called for the following:

(1) 1720 metric tons of new oil well casing and tubing of J–55 Grade, Range 2, 8 round threads and collars, with thread protectors on both ends and meeting A. P. I. [American Petroleum Institute] specifications.[4]

1. Herein referred to as Liberty.

2. No. 4707.

3. Herein referred to as Swiss Bank.

4. See (PX–A, N, O).

(2) An inspection certificate stating that materials met A. P. I. specifications.[5]

(3) All drafts to be accompanied by a full set of clean onboard ocean bills of lading to order of shipper, blank endorsed, marked "Notify Bank of America * * *".[6]

(4) Insurance, ocean freight, duties and taxes, if any, to place above materials f. o. b. Houston, Texas, to be paid for by seller and evidenced by vouchers attached to the drafts when submitted for payment.[7]

(5) All drafts to be accompanied by, (a) commercial invoices; (b) consular invoices; (c) railway weight certificates.[8]

Although both drafts were drawn under the same letter of credit we must consider each draft individually inasmuch as the factual situation surrounding each is different.

### A. Liability of Liberty as to First Draft

Liberty insists it had the legal right to return without payment the first draft for the reason that the following deficiencies existed in regard to the documentary requirements established by the letter of credit: (1) no consular invoice was furnished; (2) an incomplete set of onboard bills of lading was furnished; (3) no vouchers evidencing payment of insurance, ocean freight, duty and taxes

were furnished; (4) the ocean bill of lading was but a copy of the original set and did not purport to be an onboard bill; (5) the bill of lading was not a shipper's bill;[9] (6) the copy of the bill of lading was foul and unclean; (7) the commercial invoice did not state that the casing met A. P. I. specifications; (8) the letter called for new pipe and the rail weight certificates explicitly recited the pipe to be secondhand; (9) the original letter of credit called for A. P. I. monograms and although these monograms were waived, the standard of quality was retained in the description of the goods.

Obviously, this is not merely a case involving the independent judgment of two banks in regard to whether or not, apart from other considerations, the documentary requirements of the letter of credit accompanied the drafts in question. Clearly, the primary force which moved Liberty to reject the drafts in question was the dissatisfaction of Liberty's customer, Anderson-Prichard, with the character and quality of the goods delivered under the contract.[10]

Although there is a line of authority which could be interpreted to require that each "t" be crossed and each "i" be dotted by any and all banks dealing with letters of credit and drafts negotiated thereunder, such an interpretation of this line of authority is improper.[11] Certain practical considera-

5. Although the furnished inspection certificate (PX–30) did not measure up to the original requirement of the letter of credit (see PX–N) Liberty approved the inspection certificate in its presented form and cannot now rely upon the original requirement. (See R 240.)

6. See (PX–A).

7. See (PX–I, L, M).

8. See (PX–I, N).

9. The bills which accompanied both drafts did not purport to be shippers' bills. Article 24 of the Uniform Customs provides: "Banks have the right to require that the name of the beneficiary of the credit appear on the bill of lading as shipper or endorser." (PX–65.)

10. As mentioned in Liberty's letter of March 6th to the Bank of America at the time the first draft was returned, "Our customers advise us that the shipment has arrived and has been inspected, and that it does not meet the requirements of our Letter of Credit, but on the contrary is valueless except for scrap iron and they have instructed us to refuse payment of the draft. * * *" (DX–7.)

11. However, clearly where specific documents are called for in a letter of credit, nothing short of the production of these documents will make the insurer of the credit responsible. Continental National Bank v. National City Bank of New York, 9 Cir., 1934, 69 F.2d 312, certiorari denied 293 U.S. 557, 55 S.Ct. 69,

tions must be taken into account in determining whether the terms of the letter of credit have in fact been met.[12]

This Court frowns upon mere technical defenses where in essence the contractual understanding between the parties has been met.[13] In disposing of several highly technical irregularities raised by way of defense, the Court in Richard v. Royal Bank of Canada applied the true principle when it said:[14]

"We find no merit in any of these points. The letters of credit did not require the drawing of drafts. They assumed that they would be drawn, but, had they been drawn by a seller of the iron, the defendants, who were financing Fogel in his purchases, could not have sued the drawers thereof. To be sure, the drafts would have served as vouchers, but the receipts furnished were as good. Likewise, as to the weight certificates, the weight is given on the invoices, and approved by the persons designated to approve the weight certificates. No possible purpose could be served by having separate documents, although such appear to be more customary.

"In regard to the indorsement on the bills of lading of 'freight collect,' the bills all show that the freight was to be paid by the consignee, and that was enough."

However, in the case at bar, at least two of the deficiencies raised by Liberty amount to more than mere technical defenses and in fact become most significant in regard to whether the letter was in fact complied with on all material points. Where a material defect exists, even though avowedly the defense is raised to protect the customer of the bank urging the defense, there is no reason, moral or legal, why such a defense may not be urged, particularly

79 L.Ed. 659; Anglo-South American Trust Co. v. Uhe, 1933, 261 N.Y. 150, 184 N.E. 741. As stated in Moss v. Old Colony Trust Co., 1923, 246 Mass. 139, 140 N.E. 803, at page 808: " * * * There is no promise to pay unless drafts are in strict conformity to the authority conferred. The letter of credit, when so accepted and acted upon by the person in whose favor it is issued, becomes a contract between them wholly independent of the relation between the writer of the letter of credit and its customer by whose procurement the letter was issued, except perhaps in so far as these may be incorporated in the letter. The writer of the letter of credit also has no immediate concern with the relations between the person to whom it is addressed and by whom it is accepted on the one side and the person with whom he has commercial transactions on the other side. The writer of the letter is bound strictly to the terms of his contract as expressed in its letter. *The bank as the writer of the letter of credit will not be bound to accept and pay bills or drafts drawn against it unless the holder of the letter pursues and conforms in every material particular to the authority conferred therein.*" (Emphasis supplied.)

12. See Lamborn v. National Bank of Commerce, 1928, 276 U.S. 469, 48 S.Ct. 378,

72 L.Ed. 657; Bank of New York Trust Company v. Atterbury Bros., 1930, 226 App.Div. 117, 234 N.Y.S. 442, affirmed 253 N.Y. 569, 171 N.E. 786; Richard v. Royal Bank of Canada, 2 Cir., 1928, 23 F.2d 430.

13. As aptly expressed in Camp v. Corn Exchange National Bank, 1926, 285 Pa. 337, 132 A. 189, 191: "Where the question of strict compliance is one to be decided by bank officials, they are held to the duty of good faith in forming an honest judgment as to whether the papers attached to a draft correspond to the letter of credit. The integrity of foreign drafts or like bills of exchange, accompanied by commercial bills of lading and other documents drawn against letters of credit, should not be embarrassed or made difficult through technical or inconsequential reasons raised against payment. *The holders of these drafts have the right to expect that, when drafts conform in all essential requirements to the letter of credit, they will be paid by the drawee bank. * * *"* (Emphasis supplied.)

Parenthetically, it should be observed that the Court in the Camp case did not have the exact problem now before this Court inasmuch as the letter of credit in the Camp case did not require a "clean" bill.

14. Note 12, supra, 23 F.2d at page 433.

where strict compliance doubtless would have fully protected the customer and assured the customer of receiving the quality of goods bargained for.[15]

Of a certainty, the issue before the Court is not whether the prospective purchaser was presented with materials he thought he contracted to buy, but whether the banks handling the documents were chargeable with notice that the terms of the letter of credit had not been met and that the negotiation of any drafts thereunder was unauthorized.

### 1. Was the first draft accompanied by a clean bill of lading?

Whether a particular bill of lading is clean or foul is a very technical question; its answer is both one of fact and of law.[16] After careful consideration the Court believes the bill in question cannot qualify as a "clean" bill.

Two suitable definitions of a clean bill are:

(1) " * * * it may be said that a 'clean' bill of lading is one which contains nothing in the margin qualifying the words of the bill of lading itself. [Citing cases.]" [17]

(2) "The description 'clean bill of lading' imports one which contains nothing written, stamped or printed in margin qualifying words of bill of lading itself." [18]

On the bill before the Court the printed words in the bill "in apparent good order and condition" were deleted by the carrier; immediately below this extinction was the typewritten insertion "ship not responsible for kind and condition of merchandise"; in the body of the bill was stamped, "ship not responsible for rust".[19]

The Uniform Customs and Practice of the Seventh Congress of the International Chamber of Commerce[20] are by direct reference incorporated into the letter of credit here involved.[21] Article 18 of this Uniform Customs provides that:

"Shipping documents bearing reservations as to the apparent good order and conditions of the goods may be refused."

Although, of course, a testifying expert witness cannot instruct the Court in regard to the applicable law of the case, testimony dealing with what the commercial world deems to be a "clean" bill is competent. As mentioned

---

15. Such must be sharply distinguished from the situation wherein the terms of the letter of credit in fact are met, but the insurer of the credit discovers by business standards he has made a "bad buy", or for any other reason merely wishes to cancel the contract and responsibilities arising thereunder. An illustration of the latter is Second National Bank of Hoboken, New Jersey v. Columbia Trust Company, 3 Cir., 288 F. 17, 22, 30 A.L.R. 1299: "He [the drawee bank] refused to pay the draft and accept the sugar in the following language: 'I am very sorry we cannot pay this draft. We have been instructed by S. Fisher & Co. not to pay. I am sorry indeed to have any trouble with the Columbia Trust Company, but we cannot pay the draft.' We think that the presentation of these documents was a substantial compliance with the letter of credit. * * * *The truth is that the defendant did not want the sugar, and*

*was trying to devise some means by which it could avoid taking it, and thus escape its obligation.*" (Emphasis supplied.)

16. See The Isla de Panay, 2 Cir., 1923, 292 F. 723; Northern Industrial Chemical Co. v. Davis, 1924, 249 Mass. 246, 144 N.E. 64.

17. Thomas Roberts & Co. v. Calmar S. S. Corp., D.C.Pa.1945, 59 F.Supp. 203, 209.

18. Givaudan Delawanna, Inc., v. The Blijdendijk, D.C.N.Y.1950, 91 F.Supp. 663, 664, Syl. No. 1. Also, see 80 C.J.S., Shipping, § 111, page 904.

19. See (DX–1).

20. See (PX–65).

21. "All negotiations under this credit will be governed by the Uniform Customs and Practice for commercial documentary credits fixed by the Seventh Congress of The International Chamber of Commerce, with guiding provisions." (DX–B.)

in Northern Industrial Chemical Co. v. Davis:[22]

"Words, 'clean bill of lading,' being technical expression of trade, it was not error to admit testimony of experts, to interpret phrase * * *."

Such is only reasonable. In interpreting any contract the intention of the parties must be obtained. Where technical expressions or phrases are used, presumably they are used in the manner commonly understood in that specific sphere of the business world from which they are drawn, unless expressly negated; consequently, the meaning thereof is incorporated by reference into the contract with the same force as if set down in detail.[23] However, apart from expert testimony, the Court believes that a reasonable interpretation of Article 18 of the Uniform Customs indicates that the bill in question did bear "reservations as to the apparent good order and conditions of the goods" and thus could be refused by Liberty.[24]

■ Plaintiff argues that inasmuch as the bill in suit was subject to the provisions of both the Harter Act[25] and the Carriage of Goods by Sea Act[26] and as both acts provide that no shipowners shall be relieved from liability for loss or damage arising from negligence or fault on the part of the ship and its crew, and that all words or phrases inserted in bills of lading or shipping receipts "shall be null and void and of no effect"[27] that the alterations in question cannot result in making the bill unclean or foul. However, although such notations have "no effect" in regard to the shipowner's own liability, such does not mean that notations, when made, have no effect in regard to whether the bill is clean or foul from the viewpoint of banks operating within the confines of a letter of credit. Presuming the shipowner knows of this law, it may be argued vehemently that the shipowner had no thought of limiting his own liability for negligence but was putting all parties on notice that the condition of the goods, upon his receipt, left much to be desired.

Plaintiff further asserts that inasmuch as section 1303(3) (c) of the Car-

22. 1924, 249 Mass. 246, 144 N.E. 64.

23. As mentioned by Judge Swan: "It is true, as the defendant argues, that the law requires strict compliance with the terms of a letter of credit. * * * It is likewise true that numerous cases, several of which are cited by the defendant, declare that evidence of a custom is not admissible to contradict the unambiguous terms of a written contract [citing cases]. But it is also well settled 'that parties who contract on a subject-matter concerning which known usages prevail, incorporate such usages by implication into their agreements, if nothing is said to the contrary' [citing cases]." Dixon, Irmaos & Cia v. Chase Nat. Bank of City of New York, 2 Cir., 1944, 144 F.2d 759, 762.

24. It should be observed that, doubtless, a different result would be reached under the customs established by the Thirteenth Congress which have been in effect in the United States since January 1, 1952. The amended Article 18 provides:

"A clean bill of lading is a bill of lading which does not include overadded clauses expressly certifying the faulty state of the goods or of its condition. *The bills of lading will be considered as clean even if they contain the clauses:* (a), *which, without expressly certifying that the goods and/or the condition are faulty, suggest however that this could be the case,* for instance boxes for re-utilization, used barrels, etc.; (b) *which free the carrier from the responsibility of the risks arising from the nature of the goods and/or its condition;* (c) by which the carrier declares to ignore the contents, the weight, the measurements, the quality or the technical specifications of the goods." (Emphasis supplied.) See (PX–56, pp. 3, 4.)

Obviously, unless a legitimate question existed under the customs of the Seventh Congress as to the status of a bill such as the one in the instant case there would have been no need to expressly cover this point by (a) and (b), supra.

25. 46 U.S.C.A. §§ 190–195.

26. 46 U.S.C.A. §§ 1300–1315.

27. See n. 25, supra, 46 U.S.C.A. §§ 190, 191 and n. 26 supra, 46 U.S.C.A. § 1303 (8).

riage of Goods by Sea Act provides that,[28]

" * * * no carrier, master, or agent of the carrier, shall be bound to state or show in the bill of lading any marks, number, quantity, or weight which he has reasonable ground for suspecting not accurately to represent the goods actually received, or which he has had no reasonable means of checking." that the shipowner in the instant case had no intention either one way or the other to set out on the bill of lading "the apparent order and condition of the goods", and was merely stating he did not know the condition of the goods. Conceivably such an argument could explain the striking out of the printed words in the bill "in apparent good order and condition", but when this deletion is coupled with the inserted typewritten notation "Ship not responsible for kind and condition of goods" with the further addition by stamp "Ship not responsible for rust", obviously the shipowner intended to do more than just purport to show he was not in a position to pass upon the condition of the goods received.

2. Did the documents accompanying the first draft put those persons negotiating the draft legally on notice that the fundamental term of the letter of credit requiring new casing was violated?

Conceding for argument that the bill of lading in question technically was not "foul", distinct from such issue and even of more force is the fact that the documents taken as a whole legally placed all banks handling the transaction upon notice that a fundamental term of the letter of credit had not been met.

The Court appreciates that transactions similar to the one here involved must be handled under the unrelenting pressure of commerce, handled within a limited time for a limited fee; there is no intention or desire to place upon any bank a duty capable of execution only in the mind of a legal theorist. However, although the compensation is small and the responsibility great, once a bank accepts this duty is is bound to efficiently and accurately discharge the duty to the protection of all concerned.

Certainly the only function of any of the banks in the instant case was to see that the accompanying documents were regular and that they conformed with the letter of credit; no possible thought of responsibility exists as to the condition of the goods shipped apart from the picture of the transaction as reflected by the papers before the bank officials.

Unquestionably, no legal duty rested upon the Swiss Bank or the Bank of America, all other things appearing regular to even read, let alone translate the railway weight certificates which in the instant case indicated the materials were secondhand and did not conform to the letter of credit;[29] however, the patent irregularities in the bill of lading, if not sufficiently persuasive to the Swiss Bank or the Bank of America to establish it was foul and prohibit the negotiation of drafts under the letter of credit, certainly were sufficient to have served as a "red flag" directing the bank to scrutinize carefully all accompanying documents for all clues which would aid the banks to determine whether the terms of the letter of credit had been met.[30] Although counsel for plaintiff emphasizes the danger inherent in returning to the Swiss Bank the for-

28. Note 26, supra.

29. As stated in Article 34 of the Seventh Congress: "When other documents are required, such as: Warehouse Receipts, Delivery Orders, Consular Invoices, Certificates of Origin, Certificates of Weight, of Quality or of Analysis, without further definition, Banks may ac-

cept such documents as tendered without responsibility on their part." (PX–65.)

30. Such irregularities served to accent the general duty under Article 10 of the Uniform Customs that "Banks must examine all documents and papers with care

warded documents upon a mere suspicion that the bill was "unclean", particularly had it developed that the shipped goods were satisfactory and the action of Bank of America had prohibited the consummation of the deal, no one can seriously urge that had the Bank of America learned the casing was secondhand by reading the railway weight certificates it would not clearly have been justified in immediately returning the documents to the Swiss Bank.[31] Consequently,

so as to ascertain that on their face they appear to be in order."

In regard to the inspection certificate the Swiss Bank said: "Being fully aware of the great attention which we had therefore to direct to this inspection certificate in the quality of paying Bank, and of the importance of this main document, we were shocked at the sight of its exceedingly poor and elusive wording." (PX–56, p. 2.) Although neither Liberty nor its customer Anderson-Prichard can complain as to form of the inspection certificate inasmuch as Liberty expressly approved such a certificate (R 240, PX–B) and even though as a practical matter doubtless this entire controversy now before us would have been avoided if Liberty and its customer had not modified the original inspection certificate requirement (See PX–N) nonetheless, the loose wording of the inspection certificate certainly should have called for careful scrutiny by all banks handling the papers. Bank of América was specifically put on notice regarding the question of quality of goods raised by the inspection certificate, and stated in its letter to Liberty on February 9, 1951: "Our correspondent in transmitting the documents had made reference to the cablegram they sent us concerning the Inspection Certificate. They state that the wording is not quite to their liking and they deemed it advisable to bring the matter to our attention." (PX–11.)

Arnold of Anderson-Prichard became suspicious when he first observed the bill of lading. See (R 226). Arnold mentioned the qualifications appearing on the bill to Rodman who upon returning to Oklahoma City had the railway weight certificates translated; the translation revealed that the goods were secondhand. (R 243–246.) Also, the importer, Tegtmeyer, readily recognized that the railway weight certificates showed the goods to be used. (R 144, Blake.) The fact that these two persons, independently, realized from the documents that the materials were secondhand lends force to the Court's observation that the Swiss Bank and Bank of America should so have learned.

31. Although Rodman of Anderson-Prichard agreed to waive the vouchers showing that wharfage and duties had been paid on the first shipment, which was based upon the belief that all other documents would be in order, when Rodman saw the qualifications on the bill and discovered that the casing was secondhand he had the right to refuse to waive these requirements. (See PX–37.) Clearly, the final waiver had to come through Liberty inasmuch as technically the plaintiff could not rely upon the waiver given by a third party. North American Manufacturers Export Associates v. Chase National Bank, D.C.N.Y.1948, 77 F.Supp. 55.

Of some significance is the fact that when Liberty refused payment because the bill of lading was not an "onboard" bill of lading the plaintiff made a most strenuous effort to correct this omission. (See DX–7, along with DX–9, 10, 11, 12.) It may be noted that the fact that the goods actually reached the port of debarkation, does not necessarily dispense with the requirement that instruments called for to insure the shipment are not furnished. Moss v. Old Colony Trust Co., note 11, supra.

As recognized by Bank of America on February 28th in its cablegram to the Swiss Bank: "Yours 26th Credit 4707 Excess Shipment 20.05 Tons 6/58 Acceptable Stop We Credit Dollars Five/Six Four Zero Cents Seven Zero Stop *However Understand Documents Stipulate Merchandise is Second Hand Which Not Repeat Not Acceptable Under Any Circumstances Stop Advise By Cable.*" (Emphasis supplied.) (See PX–40.) Again on March 5th the Bank of America cabled the Swiss Bank: "Reference Our Credit 4707 Your No 13298 Understand Serious Dispute Over First Shipment Has Arisen Between Buyer and Seller Stop *Recommend All Documents For Subsequent Shipments Be Thoroughly Scrutinized Before Effecting Payment* Stop Your Cooperation Appreciated". (Emphasis supplied.) (See PX–42.) Although these warnings came too late to prevent the completion of the transactions in question, the only reasonable implication is that had Bank of America

without passing upon the other irregularities raised by Liberty in regard to the first draft [32] the Court believes that the two irregularities discussed, the foul bill of lading and the discoverable fact the goods were secondhand and not new, are so violative of the letter of credit and prejudicial to the legitimate interests of the credit insurer, that Liberty was entitled to recognize such deficiencies and refuse to accept the draft.

3. Is Liberty liable for payment of first draft for failing to return same within the statutory time allowed?

The two Oklahoma statutes which deal with the acceptance of bills of exchange read: [33]

(1) "The drawee is allowed twenty-four hours after presentment in which to decide whether or not he will accept the bill; but the acceptance if given dates as of the day of presentation."

(2) "Where a drawee to whom a bill is delivered for acceptance destroys the same, or refuses within twenty-four hours after such delivery, or within such other period as the holder may allow, to return the bill accepted or non-accepted to the holder, he will be deemed to have accepted the same."

Unquestionably the draft in question was not a sight draft and could not be considered as presented on Monday, February 26th, the day Liberty received the draft.[34] The letter of transmittal clearly implies that presentment was not to take place prior to the time Liberty was advised by the Second National Bank of Houston that all customs, duties and port charges, in regard to the first shipment, had been paid, enclosing receipts therefor; and that Liberty had until early the next week to pay same.

The evidence demonstrates that the information and documents to be furnished by the Houston bank were not received by Liberty's Mr. Hinkle until sometime after the defendant bank opened for business Monday morning, March 5th.[35] Hinkle, after counselling with its customer together with its own attorneys, returned the draft the following morning, Tuesday, March 6th.[36]

The evidence further shows that the telegram from Bank of America dated March 3rd,[37] was not received by Hinkle until sometime after Liberty opened for business March 5th, Monday.[38]

■ Not only did Liberty return the draft the next day after receiving the documents which were a condition precedent to presentation of the draft, but by returning the draft Tuesday, March 6th, Liberty complied with the express terms of the letter of transmittal which accompanied the draft wherein Bank of America stated, "We look forward to receiving the funds during the early part of the coming week."[39] Liberty's

known, as it should have known, that the goods were secondhand all documents would have been returned to the Swiss Bank immediately upon receipt.

32. Other irregularities include: (1) the ocean bill of lading was not a part of the original set but a copy which did not purport to be an onboard bill (PX–28); (2) the bill was not a shipper's bill of lading nor was it endorsed by the shipper in accordance with the letter of credit and Article 24 of the Uniform Customs. (R 260); (3) the consular invoice did not accompany the draft; (4) no attempt was made to furnish a full set of onboard bills of lading.

33. 48 Okla.Stat.Anno. §§ 295, 296.

34. Although referred to in the letter of transmittal as a "sight draft", the accompanying letter in its entirety unmistakably gave Liberty the right to hold the draft until certain papers and information in regard to payment of wharfage and duty were received from the Second National Bank of Houston; clearly, payment was not expected until the first part of the week beginning March 5th.

35. Read (R 186–188).

36. See (R 221, DX–7).

37. See (PX–22).

38. See (R 188, Hinkle).

39. See (PX–16).

action in returning the draft on Tuesday can only be interpreted that there was full compliance with the time allowed by the holder.

### B. Liability as to second draft

Although some of the irregularities which were noted in regard to the status of documents accompanying the first draft also exist in connection with the second draft,[40] Liberty is clearly absolved from liability on the second draft for the reason that the attempted negotiation took place after the expiration of the letter of credit.

As mentioned previously, where a letter of credit is substantially complied with every reasonable effort should be made by the Courts to uphold its validity, particularly where the objections are technical in nature and made only in an effort to escape from the legal effect of a business bargain.

However, this Court knows of no instance where the precise time for expiration in regard to draft negotiation has been interpreted as merely a technical objection; the time set for the letter of credit to be in effect, both as to shipment and draft negotiation, are probably the most important and material requirements in regard to the relative rights of the parties set down by the letter of credit.[41]

Although a number of modifications of the original letter in the instant case took place, which included several amendments in regard to expiration dates, the evidence unmistakably indicates that the last date authorized for negotiation was March 31, 1951.[42] At such time all liability under the letter ceased.

All parties concerned meticulously saw to it that the letter of credit was extended, as to time, on a number of occasions; beyond doubt all concerned believed such amendments imperative. Such eliminates any question of estoppel.[43]

40. Bank of America furnished a consular invoice (which was not furnished with the first draft) but only provided one bill of lading; this bill had stricken therefrom "in apparent good order and condition" with the inserted qualification "ship not responsible for kind and condition of the goods". (PX-45.) Also, the railway weight certificates revealed that the casing was secondhand. (PX-65.)

41. As said in G. Jaris & Co. v. Banque D'Athenes, 1923, 246 Mass. 546, 141 N. E. 576, 577 : "Where a date is fixed as the time for the expiration of a letter of credit, that becomes an important and essential condition. There must be strict compliance with it before there can be liability on the part of the bank issuing the letter of credit. [Citing cases.]" See also Barde Steel Products Corporation v. Franklin National Bank, 3 Cir., 1922, 281 F. 814; Anglo-South American Trust Company v. Uhe, note 11; supra.

As stated in Uniform Customs, article 38: "The period for which all irrevocable credits are to remain in force must be stipulated. The period may be either a time for payment or a time for shipment. If the credit does not specify which, the Bank shall consider the date to be the day for payment and *after its expiration shall refuse payment, even if the documents bear a date within the time for payment*." (Emphasis supplied.) (PX-65.)

42. The last extension from Liberty was under its telegram of February 26th, which provided among other things: " * * * This Will Be Your Authority To Extend This Letter of Credit Permitting Shipments To Be Made Up To and Including March 20, 1951 *With Negotiations of Drafts To and Including March 31, 1951.*" (Emphasis supplied.) (PX-18.) This telegram was confirmed by letter the same day. See (PX-19.)

43. In discounting any question of estoppel in regard to the expiration date is the fact that almost without exception all modifications of the letter of credit were accompanied by the statement "all other terms of the letter of credit are to be strictly complied with". (1) See defendant's cablegram of February 1st in regard to inspection certificate (DX-14). (2) See letter of February 2nd (DX-6). (3) See defendant's wire of February 10th accepting inspection certificate (DX-13). (4) See defendant's wire of February 28th regarding additional goods (DX-21).

The original letter provided for shipments not later than January 31, 1951, and for negotiations of drafts not later than February 15, 1951.[44] Specific amendments were made as follows:[45]

(1) On January 29th, the defendant by telegram extended the shipment date to February 6th which extension was confirmed by letter.

(2) On February 3rd plaintiff sent a rush wire to defendant stating that it understood arrangements were being completed to extend the shipping date to February 28th and the expiration date to March 15th and requested instructions. Defendant immediately extended the date of shipment to February 25th and the time for negotiating drafts to March 10th; this extension was confirmed by a letter dated February 5th.

(3) On February 26th the final extension was granted by the defendant which permitted shipments to be made up through March 20th and negotiations of drafts up to March 31st; this was confirmed by letter.

 It is only reasonable that the expiration date under an irrevocable letter of credit fix with certainty the relative liability of all parties. Furthermore it has been held that not only is the issuing bank no longer liable under the issued letter but the customer at whose instance the letter is issued is no longer responsible to the issuing bank for reimbursement, where the letter has expired.[46]

## II

Is Liberty Liable to Bank of America for the Two Deposits Made to the Account of the Union Bank Without Regard to the Two Drafts Drawn Under the Letter of Credit?

[25, 26] Separate and apart from liability arising by virtue of the letter of credit, and drafts drawn thereunder, the evidence establishes that Bank of America credited the account of the Swiss bank a total of $142,300.84 under the express direction and guaranty of Liberty. For this amount Liberty must stand liable.[47]

After considerable correspondence and several conversations between the parties, which discussions included an officer of Anderson-Prichard, Liberty telegraphed the following authorization:[48]

"Authorize payment Geneva on receipt of cable advice from Union Bank of Geneva, Switzerland, that they hold documents required your letter to them December 20, 1950 * * * monies paid on receipt of cable * * * shall not exceed $266.73 per metric ton for oil well casing or $335.00 per metric ton for oil well tubing * * *".

In recognition of Liberty's telegram, Bank of America cabled the Swiss Bank:[49]

Not to be overlooked is the fact that Bank of America permitted Tegtmeyer to draw the second draft on April 11th at a time when Bank of America had learned that the documents showed the shipped materials to be secondhand. (R 121–123, Blake.)

44. See (DX-A).

45. See (PX-3, 4, 7, 8, 9, 18, 19), respectively.

46. See G. Jaris & Co. v. Banque D'Athenes, note 41, supra; Barde Steel Products Corporation v. Franklin National Bank, note 41, supra; Anglo-South American Trust Company v. Uhe, note 11, supra.

47. It is elementary that where one party pays out money at the special request of another that the law implies a promise on the part of the latter to repay such amount. See Sommer v. Nakdimen, 8 Cir., 1938, 97 F.2d 715; Island Petroleum Co. v. Collector of Internal Revenue, 4 Cir., 1932, 57 F.2d 992, certiorari denied 287 U.S. 646, 53 S.Ct. 92, 77 L. Ed. 558; George A. Moore & Co. v. Mathieu, 9 Cir., 1926, 13 F.2d 747, certiorari denied 273 U.S. 733, 47 S.Ct. 242, 71 L.Ed. 864.

48. See (PX-P).

49. See (PX-32). The Bank of America also notified Liberty that such authorization to the Swiss Bank had issued from Bank of America in conformity with Liberty's telegram.

"Upon receipt your authenticated cablegram indicating amount negotiated quantity shipped and credit terms met, we will reimburse you accordance your instructions * * *".

On January 8, 1951, Bank of America received from the Swiss Bank an airmail letter dated January 3rd which included the statement:[50]

"We acknowledge receipt of your cable of December 29, 1950 * * * We have further advised the beneficiaries that we are authorized to pay conform (ed) documents at our bank, under cable advice to you."

On February 2, 1951, upon cable advice from the Swiss Bank, the Bank of America deposited $90,660.14 to the Swiss Bank's account;[51] again, on February 27, 1951, Bank of America upon cable advice credited the Swiss Bank's account with the sum of $56,640.70.[52]

The two cablegrams received by Bank of America from the Swiss Bank meant that the Swiss Bank had received the documents under the letter of credit and that they had paid out on the strength of those documents, and were in turn requesting reimbursement from the Bank of America.

Conceding the documents did not comply with the requirements set forth in the letter of credit, the deliberate choice was Liberty's and not the Bank of America in vesting the Swiss Bank with authority to pass upon the documents at the time the beneficiaries in Europe asked for their money.

Liberty urges that their authorizing telegram waived no rights to which they were entitled under the letter of credit and that the actions of Bank of America taken in their entirety indicate that Bank of America at all times considered that Liberty and Liberty's customer, Anderson-Prichard, had the right to be presented with all documents in conformity with the letter of credit before becoming liable for any money drawn thereunder.[53] However, the sharp distinction to be noted is this! Liberty by its telegram unqualifiedly agreed to be bound by the judgment of the Swiss Bank in approving the original documents and paying the beneficiaries of the letter in Europe; this is the reason the reliability and dependability of the Swiss Bank was carefully discussed.[54]

50. See (PX–34).

51. See (PX–25, 36, 5) for correspondence in regard to this transaction.

52. See (PX–26, 40).

53. The evidence unquestionably establishes that Bank of America made every effort to furnish the documents required under the letter of credit and that Bank of America considered it necessary to make such compliance before requesting reimbursement for the drafts negotiated under the letter of credit. See testimony of Blake, officer of Bank of America who handled this transaction. (R–79 (46), (47)) (Cf. 236, 237, Rodman). See also (DX–1, 7, 8, 11, 13, 14, 15, 16, 21, 22) and (PX–36, 40, 55). Compare (DX–6, 10) and (PX–44, 46, 56).

54. As Mr. Blake testified in regard to Liberty's approving "cable advice": "A. As I recall, looking back on it in regard to payment by cable transfer, Mr. Tegtmeyer received a request from Mr. Lieberman in Switzerland to have the credit so amended; Tegtmeyer called me asking me what it meant, and in keeping with usual banking practice, I explained to him what it meant. I believe he then called Mr. Rodman on the telephone, and it was sometime after that, I don't recall whether it was that day or the day later or two days later that Mr. Rodman called me and talked it over again. I recall that I did explain to him what the payment by cable transfer meant. *It is more than likely that we talked about the Union Bank of Switzerland, that is their position in the international field. At that time I told him that it was a very substantial bank, a very important bank.* I believe that I told him that, *and* that answer is still * * * Q. (Interposing) Is that true? A. That's true and it's true now." (Emphasis supplied.) (R–284, 285.) Also see (R–236, Rodman). Obviously, the only purpose in discussing the reliability of the Swiss Bank was to enable Liberty and its customer to determine whether or not the Swiss Bank should be trusted to pass upon the documents as presented in Europe.

Although Liberty, with permission of its customer, authorized the payment in Europe to the sellers of the pipe, Liberty did not waive any rights in relation to drafts specifically drawn under the letter of credit which would necessarily include in their amounts the fee and commission of the importer Tegtmeyer, the customer of Bank of America.[55] Obviously, if both drafts had been negotiated successfully, the amounts credited to the Swiss Bank would have been included and the position of Liberty as one directing payment by Bank of America to the Swiss Bank would have become a moot question.

The two credits to the Swiss Bank's account were made on February 2nd and February 27th, respectively;[56] inasmuch as Bank of America was under no legal obligation to charge back these credits,[57] even though the Swiss Bank

55. This accounts for the continued effort of Bank of America to furnish Liberty with all documents required under the letter of credit. Not only did Bank of America want to bring this transaction to a satisfactory conclusion for all concerned, but it also certainly wanted to collect for its customer, Tegtmeyer, the larger amount involved under the drafts, which included the commission of the customer.

56. It might be argued that inasmuch as if Bank of America had discovered that the shipped casing was secondhand at the time the documents which were attached to the first draft arrived from the Swiss Bank on February 24th that the second deposit made to the Swiss Bank account upon "cable advice" on February 27th might have been avoided. However, such a contention is without merit. Admitting that Bank of America discovered the first set of documents did not conform to the letter of credit, would in no way imply that the second set of documents regarding the second shipment were likewise not in conformity with the letter of credit. So long as Liberty's authorization was in effect giving the Swiss Bank the authority to pass upon the sufficiency of the documents in paying the vendor, Bank of America was bound to credit the Swiss account and could look to Liberty for reimbursement for the amounts paid out.

57. Although the Court believes the Swiss Bank violated its contract and paid out in violation of its agreement with Bank of America, Bank of America nevertheless has the right to look to Liberty for reimbursement if it so desires; Liberty if it wishes can then proceed as subrogee against the Swiss Bank. Bank of America in a transaction admittedly as controversial as the one under consideration had no duty to mitigate damages by reversing the prior credits. As mentioned in Restatement of the Law (Contracts), Section 336(1), p. 535: "Damages are not recoverable for harm that the plaintiff should have foreseen and could have avoided by reasonable effort *without undue risk, expense or humiliation.*" As stated in Frederick Raff Co. v. Murphy, 1929, 110 Conn. 234, 147 A. 709, 712: "The duty of the plaintiff to keep the damages from the breach of the defendants' contract as low as reasonably possible does not require of it that it disregard its own interests or exalt above them those of the defaulting defendants. [citing case] * * * It [plaintiff] was not required to take a course that would subject it to the loss of profits on its own part of the bid, and which, as the trial court has in effect found, would to a material extent adversely affect the good will of its business. [Citing case.]" Also, by analogy the duty of banks in regard to commercial paper absolves plaintiff from any outright duty in the instant case to reverse the credits previously made to the Swiss account. 7 Am.Jur. pp. 466–467, §§ 642, 645, states the rule as follows: "According to the weight of authority, a bank is under no duty to a surety or indorser on a note held by it to apply, in payment thereof at maturity, any amount which the principal or maker may have on general deposit in the bank, and the bank's failure to apply the deposit, and its permitting the depositor subsequently to withdraw his deposit, do not, under this view, release the indorser or surety from liability. Indeed, it has been held that the fact that the surety or indorser demands that the bank make the application is immaterial. Nor is it any defense to an action by a bank against sureties on a promissory note discounted by it that it failed to comply with the direction of the principal, given before maturity of the note, to pay it at maturity out of his general deposit in the bank, and subsequently allowed the principal to check the money out of the bank, although the deposit was sufficient to pay the note. * * * The accepted rule in most jurisdictions is that

violated its agreement to not "cable advice" until all documents in conformity with the letter of credit were received, the practical reason for Bank of America permitting the second draft to be drawn by Tegtmeyer on Liberty on April 11th at a time when it was known the documents showed the shipped casing to be secondhand is apparent. Bank of America could only hope that the two drafts would be honored. Doubtless, there was some expectation that even though the casing was secondhand that its condition would be such that Liberty's customer might accept the shipment, pay the drafts and thus cure all documentary shortcomings.

### III
### Conclusion

It is the opinion of the Court that the Bank of America is entitled to judgment against the defendant, Liberty, for the net monetary loss suffered by Bank of America as a direct result of the two credits made to the account of the Swiss Bank under the express authority given by defendant, Liberty.

Bank of America deposited a total of $142,474.15 to the Swiss account. In addition, Bank of America paid duties and port charges in connection with the shipments in question in the amounts of $10,642.94 for the first shipment and $6,847.38 for the second shipment, and $118.28 for insurance on the goods while stored in Houston, Texas.

From this total outlay of $160,083.45 the net amount for which the shipped goods was sold of $120,249.05 must be deducted. Thus, plaintiff is entitled to judgment for $39,834.40, plus interest at 6% from appropriate dates on the applicable amounts.[58]

Counsel should submit a journal entry in conformity with this opinion within ten days.

---

while a bank which is the holder of a note or bill of exchange may, if it chooses to do so, apply to its payment the funds of an indorser, or other person secondarily liable on the instrument, on deposit with the bank, it is under no obligation or duty, either towards other indorsers or towards the person primarily liable, to apply such deposit in payment of the instrument. What is more, this is true even though the note was made for the accommodation of the indorser who, as far as the maker is concerned, is primarily liable thereon." It should be noted that in an action for breach of contract, the defendant cannot raise by way of defense that a third party may also be liable to the plaintiff for the damages sustained, or that plaintiff, if unsuccessful in the breach of contract action, intends to pursue a third party to recover the loss. Thomson v. Chicago, N. & St. P. Ry. Co., 1928, 195 Wis.

78, 217 N.W. 927; Iowa Mfg. Co. v. B. F. Sturtevant Co., 8 Cir., 1908, 162 F. 460, 18 L.R.A.,N.S., 575; Long-Costello, Inc., v. Rider, Mo.App., 1928, 7 S.W.2d 387.

58. The defendant should pay interest on $90,660.14 from February 2, 1951, and on $56,640.70 from February 27, 1951 [the dates the plaintiff paid out such sums at defendant's request] up to the date plaintiff received the $120,249.05 from the sale of the pipe in mitigation of damages. The plaintiff is then entitled to interest on the $39,834.40 from the date the amount in mitigation was received up to the date judgment is paid. Counsel should be able to stipulate as to the date the $120,249.05 was received for the journal entry of judgment; however, if a dispute exists the Court will consider additional evidence and make a special finding in regard to interest.